JAMAL P., et al., Respondents-Appellants, v CITY OF NEW YORK et al., Defendants, and ABBOTT HOUSE, Appellant-Respondent. [808 NYS2d 609]—

Judgment, Supreme Court, New York County (Michael D. Stallman, J.), entered May 20, 2004, which, inter alia, upon a jury verdict, awarded plaintiffs the total sum of $95,099.38 as against defendant Abbott House, unanimously reversed, on the law, without costs, the judgment vacated and the complaint dismissed. The Clerk is directed to enter an amended judgment accordingly.

After his mother and her boyfriend refused treatment for drug abuse, plaintiff Jamal P. was placed in foster care in December 1998. Jamal came into the custody of defendant Abbott House* after a May 1999 incident at a prior residential treatment facility, St. Agatha Home. Jamal was discovered performing fellatio on another boy, after which his mother sought, and ultimately obtained, Jamal's relocation.

Jamal was admitted to Abbott House on September 2, 1999 and assigned to a unit housing 7-to-11-year-old boys. The unit is described as a partitioned area consisting of 14 beds arranged in cubicles formed by concrete walls approximately four feet high. The following day, Jamal, together with his mother and her companion, met with the facility's campus director, and Jamal was informed that sexual contact between residents was not tolerated at Abbott House. He was instructed that if anyone attempted to involve him in sexual conduct, he should cry out for help or seek out the assistance of a staff member.

On the night of January 2, 2000, a child care worker, who testified that she was seated approximately 12 feet from Jamal's bed, observed a shadow moving and went to investigate. She found Jamal, then eight years old, seated on his bed, apparently engaged in an act of fellatio with another boy. The other boy was standing next to Jamal with his boxer shorts pulled down and was "moving back and forth." The boys were barefoot, the floor was carpeted, and the child care worker had heard nothing. Upon seeing her, Jamal said, "What are you trying to do?" Each boy blamed the other for the incident, and they were immediately placed in separate sleeping areas.

A psychotherapist's report completed the next day states that neither boy had called for help. While Jamal claimed that his mouth had been covered by the other boy's hand, the child care worker observed no such thing, and Jamal made no such assertion to her at the time of the incident. The therapist reiterated what Jamal should do in case he was sexually approached.

Another report completed by the home's psychotherapist states that, on January 20, 2000, Jamal and another resident were sent to bed early as the result of their misbehavior. When a child counselor went to check on them at about 8:30 P.M., she saw the other boy "in Jamal's bed with his boxer shorts pulled down exposing his genitals and Jamal's hands were in the boy's genital area." Questioned about their behavior, "both admitted that they were trying to have sex." When again interviewed by the psychotherapist the next day, Jamal angrily disavowed his

---

* This action has been discontinued as against the remaining defendants.

actions. But when confronted with his failure to call for assistance, as instructed, Jamal could offer no explanation. During his remaining seven months at Abbott House before being discharged to his mother, there were no further incidents of inappropriate sexual behavior involving Jamal.

Plaintiffs commenced this action alleging negligence in the care and supervision of Jamal. The complaint seeks damages on behalf of the infant plaintiff for psychological injury and derivative damages on behalf of his mother. At trial, Jamal testified that he was coerced into engaging in sexual activity by threats from the two boys. Jamal also maintained that his bed was located toward the back of the unit, not near the front.

To prevail on this cause of action predicated on ordinary negligence in failing to protect the infant plaintiff against alleged sexual assaults, plaintiffs must establish (1) that defendant was provided with actual or constructive notice that such assaults might be made upon the infant plaintiff so as to give rise to a duty to protect him, (2) that defendant was negligent in failing to take reasonable protective measures, (3) that the infant plaintiff sustained actual injury, and (4) that defendant's negligence was a proximate cause of that injury (*see Mirand v City of New York*, 84 NY2d 44, 49-50 [1994]; Prosser and Keeton, Torts § 30, at 164 [5th ed]). Viewing the evidence in a light most favorable to the prevailing party, as we must (*see Matter of S. Kornblum Metals Co. v Intsel Corp.*, 38 NY2d 376, 379 [1976]), we find that it is insufficient to sustain either of the first two elements. Thus, as a matter of law, the record does not support the jury's finding that defendant was negligent in the care and supervision of the infant plaintiff (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). Were we to decide otherwise, we would find that the weight of the evidence predominates against the jury's finding that the subject sexual encounters were the proximate cause of the psychological injuries alleged to have been sustained by Jamal.

There was no indication prior to either sexual encounter that any untoward behavior was about to occur. At no time did Jamal complain to Abbott House personnel that other residents were attempting to induce him to engage in acts of sexual misconduct. The first incident involved obvious stealth, and if Jamal was not, as the evidence suggests, a willing participant, neither did he make any attempt to alert the staff member seated nearby. Because each sexual misadventure involved a different boy, the home's staff had no prior knowledge that the resident involved in the second incident might initiate a sexual encounter with Jamal (*see Whitfield v Board of Educ. of City of Mount Vernon*,

14 AD3d 552, 553 [2005]). Thus, defendant lacked "sufficiently specific knowledge or notice" of the third-party conduct that is alleged to have resulted in injury so as to cast it in liability (*Mirand v City of New York*, 84 NY2d at 49 [1994]; *cf. Shante D. v City of New York*, 190 AD2d 356, 362 [1993], *affd* 83 NY2d 948 [1994]). Imposition of a requirement to guard against every "impulsive, unanticipated act" that might be committed by a fellow resident would represent an unreasonable burden on the facility and its personnel (*Mirand*, 84 NY2d at 49).

A school or similar facility is not required to provide any greater degree of supervision than that which "a parent of ordinary prudence would observe in comparable circumstances" (*id.* at 49; *see also David v County of Suffolk*, 1 NY3d 525 [2003]; *Rivera v Board of Educ. of City of Yonkers*, 19 AD3d 394, 395 [2005]). Upon admission to Abbott House, plaintiff was advised, in the company of his mother, what he should do in the event someone attempted to involve him in sexual misconduct. The child was placed in a unit containing only 14 beds arranged within separate cubicles, and the unit was always monitored. Two counselors supervised the unit's residents during the day, and the sleeping quarters were supervised by a single counselor, who was located only a short distance from plaintiff's bed (10 to 12 feet, according to her testimony). On each occasion, the supervisor on duty promptly discovered what was transpiring and separated the boys, who were subsequently provided with appropriate counseling to deter further misconduct. Plaintiff did not inform the staff of any threats or sexual advances made to him by other residents, nor did he offer any resistance to the sexual contacts so as to alert defendant's staff to intervene. Short of placing the infant plaintiff under 24-hour observation, it would have been virtually impossible to prevent a fellow resident from finding some opportunity to engage Jamal in clandestine sexual activity. To hold defendant liable for any and all such incidents would subject it to accountability as the insurer of Jamal's safety, a legally unreasonable standard (*see Michele M. v Board of Educ. of City of N.Y.*, 3 AD3d 370, 372 [2004]).

Further, the record discloses that Jamal was not the only resident in need of close supervision and that available resources were limited. Defendant's campus director explained that Abbott House had "a lot of children who needed a lot of supervision." When asked why Jamal was not assigned to a bed that permitted immediate observation, he responded, "I can never remember a time when there's only one child in those circumstances and there's only one bed up front." Finally, a major goal

of Jamal's therapy was to provide socialization, a purpose to which isolation would have been inimical (*see Kosok v Young Men's Christian Assn. of Greater N.Y.*, 24 AD2d 113, 115 [1965], *affd* 19 NY2d 935 [1967]).

This Court concludes that there is no legal basis or any valid line of reasoning and permissible inferences which would have permitted the jury to render a verdict in plaintiffs' favor (*Cohen v Hallmark Cards*, 45 NY2d at 499). In view of our disposition, it is unnecessary to reach defendant's alternative argument that the failure to award damages for pain and suffering represents a compromise verdict or plaintiffs' contention, advanced on cross appeal, that the jury's award was inadequate to compensate them for the injuries sustained by the infant plaintiff. Concur—Tom, J.P., Marlow, Ellerin, Sweeny and Catterson, JJ.