A.B. and L.B., individually, Plaintiffs,

v.

Mark STAROPOLI, Paula Staropoli, Clarkstown Soccer Club, Board Members & Employees of the Clarkstown Soccer Club, Nicholas Arcuri, Margaret Turrin, Direct Kick Soccer, Robert Walkley, John Does 1 through 5 (fictitious names for the persons, partnerships and/or corporations intended), Jane Does 1 through 5 (fictitious names for the persons, partnerships and/or corporations intended), and Richard Roes 1 through 5 (fictitious names for the persons, partnerships and/or corporations intended), Defendants.

No. 08 Civ. 4585 (LMS).

United States District Court,
S.D. New York.

March 12, 2013.

Michael R. Ascher, Einhorn, Harris, Ascher & Barbarito, P.C., Denville, NJ, for Plaintiffs.

Joseph H. Cerame, Hackensack, NJ, Jack Thomas Spinella, Nicoll Davis & Spinella LLP, New York, NY, Glen Steven Feinberg, Wilson, Elser, Moskowitz, Edelman & Dicker, Harold L. Moroknek, Boeggeman, George, & Corde, P.C., White Plains, NY, John T. Brennan, The Law Offices of John T. Brennan, P.C., Brooklyn, NY, Alan S. Goldberger, Goldberger & Goldberger, Clifton, NJ, Joseph S. Accardi, Accardi & Mirda, P.C., Livingston, NJ, for Defendants.

## DECISION AND ORDER

LISA MARGARET SMITH, United States Magistrate Judge.[1]

This action was originally filed by Plaintiffs A.B. and L.B. in the United States District Court for the District of New Jersey, *see* Feinberg Decl. (Docket # 70) Ex. A, and was subsequently transferred to the Southern District of New York by order dated April 29, 2008. *See* Feinberg Decl. Ex. B. The action was originally brought against Defendants Mark Staropoli, Paula Staropoli, Clarkstown Soccer Club, Board Members & Employees of the Clarkstown Soccer Club,[2] Nicholas Arcuri, Margaret Turrin, Direct Kick Soccer, Rob-

---

1. The parties have consented to my exercise of jurisdiction over this case pursuant to 28 U.S.C. § 636(c). Docket # 81.

2. The parties' captions variously refer to this Defendant as "Board Members & Employees of the Clarkstown Soccer Club," "Board Members of Employees of the Clarkstown Soccer Club," and "Board Members of Employers of the Clarkstown Soccer Club." Plaintiffs' original Complaint described this Defendant as the "Board of Directors of the Clarkstown Soccer Club." Feinberg Decl. Ex. A ¶ 5.

ert Walkley, John Does 1 through 5 (fictitious names for the persons, partnerships and/or corporations intended), Jane Does 1 through 5 (fictitious names for the persons, partnerships and/or corporations intended), and Richard Roes 1 through 5 (fictitious names for the persons, partnerships and/or corporations intended). On December 5, 2008, an Amended Complaint was filed which added four defendants, Tri State Youth Soccer Club and Board Members of the Tri State Youth Soccer Club, Northern Valley Soccer Camp, and Arsenal Soccer Club. Feinberg Decl. Ex, C; Docket # 19.[3] Although a notice of voluntary dismissal was filed dismissing Arsenal Soccer Club from the action on December 16, 2008, Docket # 21, no stipulation of discontinuance has been filed with respect to Tri State Youth Soccer Club, Board Members of the Tri State Youth Soccer Club, or Northern Valley Soccer Camp. These parties have never appeared in the action, and the only one which was served with the Amended Complaint was Northern Valley Soccer Camp, in care of Mark Staropoli. Docket # 28. Thus, it appears that Plaintiffs have withdrawn their claims against these three additional defendants. *See* Walkley's Mem. of Law in Supp.

(Docket # 67) at 1 n. 1 ("Some entity defendants have since been dismissed by plaintiffs."); *see also* Pls.' Omnibus Brief in Opp. (Docket # 89) at 1–2 ("The remaining Defendants are individuals and organizations who stood *in loco parentis* to A.B. during the period of time she was subjected to the sexual acts by Mark Staropoli" and include Paula Staropoli, Clarkstown Soccer Club, Robert Walkley, Direct Kick Soccer, Margaret Turrin, and Nick Arcuri).

All remaining Defendants except for Mark Staropoli now move for summary judgment on Plaintiffs' claims against them. Docket # # 66, 69, 72, 75. For the reasons that follow, Defendants' motions for summary judgment are granted.

## BACKGROUND

The following facts relevant to the disposition of the motion are undisputed unless otherwise noted.

A.B. was born on January 16, 1988. Ascher Decl. (Docket # 89–4) Ex. FF. A.B. and her father L.B. first met Mark Staropoli ("Mark") in the summer of 2001, when she tried out for the Americans soccer team. Feinberg Decl. Ex. I (A.B. Depo.) at 44:21–45:8.[4] A.B. attended a soccer

---

**3.** Plaintiffs continued to name John Doe, Jane Doe, and Richard Roe Defendants in the Amended Complaint, however, these defendants have never been identified and at this point, any claims of negligence against them would be time-barred. *See Zimmerman v. Poly Prep Country Day Sch.*, 888 F.Supp.2d 317, 336–37 (E.D.N.Y.2012) (in case involving claims of sexual abuse brought by former students against school's football coach, the court noted, with respect to the claims for negligent retention and supervision, that "[n]egligence claims are subject to the general three-year statute of limitations for personal-injury actions"; that a minor plaintiff "receive[s] the benefit of the toll for infancy created by N.Y. C.P.L.R. § 208," pursuant to which, "a minor has until 'three years after the disability [of infancy] ceases'—that is, until age 21—to bring a claim"; and "that a

cause of action for negligence accrues from the date of the injury"). In this case, all of the claims accrued by January, 2005, when Mark Staropoli was arrested, and because A.B. was a minor at the time of the alleged sexual misconduct, A.B. had until January, 2009, when she turned 21, to bring her claims. Accordingly, because any claims asserted *against them* would be untimely, the John Doe, Jane Doe, and Richard Roe Defendants are dismissed from the action.

**4.** The Joint Local Civil Rule 56.1 Statement of Clarkstown Soccer Club, Nicholas Arcuri, Margie Turrin, and Robert Walkley d/b/a Direct Kick Soccer ("Defs.' Joint 56.1") (Docket # 66–1) ¶ 1, states, and Plaintiffs do not dispute, that A.B. and L.B. first met Mark in April, 2001. However, the evidence cited, A.B.'s deposition at pages 44–45, states that they met in the summer of 2001.

camp that Mark coached at Old Tappan High School in Northern Valley, New Jersey in the summers of 2002 and 2003. Spinella Decl. (Docket # 76) Ex. A (A.B. Depo.) at 53:17–19; Feinberg Decl. Ex. I (A.B. Depo.) at 142:20–143:10. Because of the distance between the soccer camp and her home in New Jersey, Plaintiffs made arrangements with Mark to have A.B. stay at the Staropoli home for the duration of the two-week camp. Defendant Paula Staropoli's Statement Pursuant to Local Civil Rule 56.1 ("Staropoli 56.1") (Docket # 78) ¶ 2. From 2003 through January, 2005, A.B. was close friends with Mark's daughter Megan. Defs.' Joint 56.1 ¶ 2. From the fall of 2002 through the winter and spring of 2003, A.B. stayed at the Staropoli home on the weekends once or twice a month. *Id.* ¶ 3.[5] Over time, A.B. developed a close relationship with the Staropoli family, including their three daughters, referring to herself as the "fourth Staropoli" daughter. Staropoli 56.1 ¶ 5. During her first two-week stay at the Staropoli home in the summer of 2002 for soccer camp, while watching T.V. in the living room, A.B. complained about her feet, so Mark gave her a foot rub. *Id.* ¶ 6; *see* Plaintiffs' Response to Paula Staropoli's 56.1 Statement ("Pls.' Response to Paula's 56.1") (Docket # 89–2) ¶ 6 (Paula Staropoli testified that she observed Mark giving A.B. a foot rub).

A.B. was in either 9th grade (2002–2003) or 10th grade (2003–2004) when sexual contact with Mark began. Defs.' Joint 56.1 ¶ 4. During the summer of 2003, when A.B. was staying at the Staropoli home while attending soccer camp, Mark touched her below the waist. *Id.* ¶ 5. Throughout the summer of 2003, A.B. and Mark engaged in inappropriate contact between ten and twenty times, including on an airplane returning from a trip to St. Lucia. *Id.* ¶ 6; *see* Feinberg Decl. Ex. I (A.B. Depo.) at 143:15–144:15. From September, 2003, through June, 2004, A.B. and Mark had sexual contact approximately forty times. Defs.' Joint 56.1 ¶ 7. By June, 2004, A.B. and Mark had had sexual contact approximately fifty to sixty times. *Id.* ¶ 8; *see* Staropoli 56.1 ¶ 10 (from the first sexual contact until Mark's arrest in January, 2005, A.B. engaged in sexual relations with Mark on numerous occasions).

From July 18, 2004, to August 2, 2004, A.B. traveled to Europe to play soccer. The parties dispute whether the trip was organized by Robert Walkley and Direct Kick Soccer or whether Clarkstown Soccer Club also played a role in organizing the trip. *Id.* ¶ 9[6]; Plaintiffs' Responses to Defendants' Joint 56.1 Statement ("Pls.' Responses to Joint 56.1") (Docket # 89–1) ¶ 9. The Europe team was coached by Mark, and Margaret Turrin, who served as

---

**5.** A.B.'s testimony on this point is a bit muddled. At one point in her deposition, she testified that she began going to the Staropoli house about two weekends per month starting in the fall of 2002 and continuing into the winter and spring of 2003. Feinberg Decl. Ex. I (A.B. Depo.) at 106:23–107:5. Subsequently, however, A.B. testified that from the summer of 2002 soccer camp until the summer of 2003 soccer camp, she had not stayed over the Staropoli house, *id.* at 218:11–17 ("I think I may have visited there a couple of times, but I don't remember."), but that after the summer of 2003 soccer camp, she began to go to the Staropoli house "pretty regularly." *Id.* at 218:18–21; *see also* Ascher Decl.

Ex. A (A.B. Depo.) at 290:23–291:5 ("Q. Your sophomore year [September, 2003], that's when you began going to the Staropoli home during the school year; isn't that correct? A. Yes. Q. Okay. And again, generally, how often would you go there? A. Once or twice a month.").

**6.** Despite the existence of record evidence which supports the contention in paragraph 9 of Defendants' Joint 56.1 Statement that the Europe trip was a "Direct Kick trip organized by Robert Walkley and coached by Mark Staropoli," *see* Section II.B., *infra.* Defendants fail to cite any evidence in support of this statement in paragraph 9.

the assistant coach, also went on the trip as a parent/chaperone. Defs.' Joint 56.1 ¶¶ 9–10.[7] L.B. signed a form giving A.B. permission to go on the trip to Europe which stated that she would be supervised by Mark and Turrin. Defs.' Joint 56.1 ¶ 11; see Feinberg Decl. Ex. X. A.B. and Walkley first met in July, 2004. Defs.' Joint 56.1 ¶ 12.[8] Mark had his first communication with Walkley in the latter part of 2003. Defs.' Joint 56.1 ¶ 13. During their time in London, A.B. and Mark engaged in sexual acts, however, they did not engage in any sexual acts while they were in Amsterdam. Id. ¶¶ 15–16.[9]

In August, 2004, after the Europe trip, Clarkstown Soccer Club's President Nicholas Arcuri received several anonymous letters alleging that Mark and A.B. were engaged in an inappropriate relationship. Defs.' Joint 56.1 ¶ 1.7; see Feinberg Decl. Ex. K. (Arcuri Depo.) at 53, 80. The parties dispute whether this was the first time that anyone had said anything to Clarkstown Soccer Club regarding an inappropriate relationship between A.B. and

Mark. Defs.' Joint 56.1 ¶ 18; Pls.' Responses to Joint 56.1 ¶ 18. Arcuri sought advice from an attorney and then proceeded to interview several adults who had gone on the trip. Defs.' Joint 56.1 ¶ 19. However, Plaintiffs claim that Defendants failed to interview at least five other parents who were also on the trip and who witnessed unusual behavior between A.B. and Mark. Pls.' Responses to Joint 56.1 ¶ 17.[10] Arcuri spoke to Mark and to L.B., and both of them told Arcuri that these allegations were false. Defs.' Joint 56.1 ¶ 20. Arcuri contacted the Orangetown Police Department about the allegations, and the police told Arcuri that they found no evidence of criminal behavior. Id. ¶ 21. L.B. signed A.B.'s application to join the Clarkstown Soccer Club on September 27, 2004. Id. ¶ 22, A.B.'s application to become a member of the Clarkstown team was approved on November 11, 2004, however, prior to that time, A.B. had already guested for the Clarkstown team, participating in a number of practices and at least one scrimmage game. Id. ¶ 23; Pls.' Responses to Joint 56.1 ¶ 23.[11] The sexual

7. Although Plaintiffs do not dispute this statement, Defendants' record citation in their Joint 56.1 Statement does not support it. Nonetheless, there is evidence in the record to support it. See Ascher Decl. Ex. I (Mark Staropoli Depo.) at 15:24–16:6; Ascher Decl. Ex. N (Moore Depo.) at 16:5–6; Ascher Decl. Ex. H (Turrin Depo.) at 159:10–11.

8. Again, this statement is undisputed, but Defendants' record citation in their Joint 56.1 Statement does not support it. However, there is evidence in the record to support it. See Feinberg Deck Ex. AB (Walkley Depo.) at 61:19–21 ("Q. Well, did you know who [A.B.] was prior to the trip? A. No."), 118:5–7 ("Q ... Had you ever met [A.B.] before the trip? A. No.").

9. These statements are undisputed, and while Defendants' record citation for paragraph 16 supports the statement that nothing inappropriate happened in Amsterdam, the record citation provided by Defendants for paragraph 15 does not support the statement that sexual acts occurred in London. Neverthe-

less, there is evidence in the record to support that statement. See Spinella Decl. Ex. A (A.B. Depo.) at 236:20–25 (A.B. and Mark engaged in three or more sexual acts in London).

10. Plaintiffs contend, without citation to record evidence, that the Orangetown Police Department failed to conduct a thorough investigation because they "did not contact all of the individuals who attended the trip." Pls.' Response to Paula's 56.1 ¶ 19.

11. Plaintiffs contend that A.B. participated in "numerous practices and tournaments prior to her official registration" with the Clarkstown team, Pls.' Responses to Joint 56.1 ¶ 23, but the deposition pages cited in support of this statement are not attached to their motion papers, and the deposition pages that are attached evidence that A.B. began practicing with the team in mid to late September, 2004, and guested with them before going to Europe, which consisted of practicing occasionally with the team and playing in one scrimmage game. See Ascher Decl. Ex. A (A.B. Depo.) at 138:25–140:15.

contact between A.B. and Mark began before A.B. joined the Clarkstown team and had been going on for many months before A.B. had any involvement with Clarkstown Soccer Club. Defs.' Joint 56.1 ¶¶ 24–25. The sexual contact between A.B. and Mark had also been going on for many months before A.B. met Turrin in June or July, 2004. *Id.* ¶ 26. The sexual contact between A.B. and Mark had been going on for many months before A.B. had any relationship with Walkley. *Id.* ¶ 27.[12] When the allegations of a sexual relationship between A.B. and Mark first surfaced in August, 2004, A.B. told L.B. that they were not true. *Id.* ¶ 28.[13]

Before the trip to Europe in July/August, 2004, no one told Clarkstown Soccer Club, Turrin, or Walkley of any behavior by Mark that demonstrated a propensity to engage in sexual acts with a minor. *Id.* ¶¶ 29–31.[14]

On January 4, 2005, the police department in Rockaway, New Jersey, where A.B. and L.B. lived, was told that a staff member at A.B.'s high school received an anonymous report that A.B. was involved in a sexual relationship with Mark, Ascher Decl. Ex. Y (Morris County Prosecutor's Office Investigation Report and Supplemental Report). A.B. initially denied the allegation, but then admitted it to the police. *Id.* Mark was arrested and ultimately convicted in New York, after a jury trial, and in New Jersey, after entering a guilty plea. Ascher Decl. Ex. T (Judg-

ments of Conviction for the States of New York and New Jersey). He is currently in prison, serving his sentence.

## DISCUSSION

### I. Standard for Summary Judgment

Under Rule 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 320–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

Local Civ. R. 56.1(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment

**12.** Again, this statement is undisputed, but Defendants' record citation in their Joint 56.1 Statement does not support it. Nonetheless, there is evidence in the record to support it. *See* Feinberg Decl. Ex. AB (Walkley Depo.) at 61:19–21, 118:5–7 (Walkley had not met and did not know A.B. prior to the Europe trip).

**13.** Defendants state, without dispute, that A.B. also told the police that the accusations were not true, Defs.' Joint 56.1 ¶ 28, but the record citation provided only supports the

statement that she told her father that the accusations were not true.

**14.** Although this statement is undisputed as regards Turrin, Defendants' record citation in paragraph 30 of their Joint 56.1 Statement does not support it. However, in her affidavit submitted in support of her motion for summary judgment, Turrin states, "No one ever complained to me about Mark Staropoli acting inappropriately." Brennan Decl. (Docket # 73) Ex. A (Turrin Aff.) at 2.

as a matter of law. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact. *Id.*

▮ Under Local Rule 56.1(b), the papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried. Local Civ. R. 56.1(b). Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.'" *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548) (alteration in original). If the party opposing summary judgment does not respond to the motion, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed.R.Civ.P. 56(e)(3). However, even where the nonmoving party fails to respond to a motion for summary judgment, the court

> may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial. If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is presented.*

*D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 110 (2d Cir.2006) (quoting *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004)) (emphasis in original).

Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." *Mount Vernon Fire Ins. Co. v. Belize NY. Inc.,* 277 F.3d 232, 236 (2d Cir.2002); *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 97 (2d Cir.2001); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 764 (2d Cir.1998); *see also Anderson,* 477 U.S. at 261 n. 2, 106 S.Ct. 2505. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992) (quoting *H.L. Hayden Co. v. Siemens Med. Sys. Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989)).

## II. *Defendants' Motions for Summary Judgment*

### A. *Claims Against Paula Staropoli*

▮ Plaintiffs assert a claim of negligence against Paula Staropoli ("Paula") based on the assertion that Paula stood *in loco parentis* to A.B. and had a duty to protect A.B. during the times when A.B. was in Paula's care, namely, when A.B. visited the Staropoli household.

A person, other than a parent, who undertakes to control, care for, or supervise an infant, is required to use reasonable care to protect the infant over whom he or she has assumed temporary custody or control. Such a person may be liable for any injury sustained by the infant which was proximately caused by his or her negligence. While a person caring for entrusted children is not cast in the role of an insurer, such an individual is obliged to provide adequate super-

vision and may be held liable for foreseeable injuries proximately resulting from the negligent failure to do so.

*Appell v. Mandel,* 296 A.D.2d 514, 745 N.Y.S.2d 491 (2d Dep't 2002) (citations omitted).[15]

■ In addition, where an infant plaintiffs injuries are caused by the acts of a third party, the elements that the infant plaintiff must establish in order to prevail on a claim based on ordinary negligence in failing to protect him or her against alleged sexual assaults are

(1) that defendant was provided with actual or constructive notice that such assaults might be made upon the infant plaintiff so as to give rise to a duty to protect him [or her], (2) that defendant was negligent in failing to take reasonable protective measures, (3) that the infant plaintiff sustained actual injury, and (4) that defendant's negligence was a proximate cause of that injury.

*Jamal P. v. City of New York,* 24 A.D.3d 301, 303, 808 N.Y.S.2d 609 (1st Dep't 2005) (citations omitted).

Thus, the parties dispute whether Paula had actual or constructive notice that Mark would commit sexual assaults upon A.B. as would be necessary to sustain Plaintiffs' claim of negligence. The only physical contact between A.B. and Mark that Paula testified to witnessing was the one occasion in the summer of 2002 in which Mark rubbed A.B.'s feet. As described by Paula, the foot rub incident occurred "in our living room, we were all hanging around and [A.B.] was complaining I guess about her foot and so she was on that end, it was a huge couch, she was on that end, he was at this end, I was on the chair next to them and he rubbed out her foot." Spinella Decl. Ex. B (Paula Staropoli Depo.) at 45:10–15. When Mark's daughter Megan was asked, "[I]f a girl was in the house and she was a soccer player on the team and she was complaining that her foot hurt or that her shoulder hurt or some such thing, would it be unusual for your father to give the person a foot rub or a shoulder massage," Megan replied, "No." Spinella Reply Decl. (Docket # 95–1) Ex. Z (Megan Staropoli Depo.) at 130:4–9.

■ Plaintiffs provide no other evidence of inappropriate behavior either witnessed by or known to Paula until the Europe trip in July/August 2004. During the Europe trip, non-party witnesses testified that Paula was aware of the following inappropriate behavior: (1) A.B. and Mark lying next to each other in a soccer field, which was allegedly witnessed by numerous players, parents, and coaches including Paula,[16] *see* Ascher Decl. Ex. D (Frey Depo.) at 120:4–121:3 ("[O]ne time Paula and I went into town to ... get chicken sandwiches for the team ... and when we came back Mark and [A.B.] were laying side by side together in the grass and as we approached them [A.B.] sat up and said, oops, I guess I better got out of here. She got up and left."); Ascher Decl. Ex. F (Young Depo.) at 95:13–96:3, 97:8–10, 99:15–17 ("Q. Why do you believe that Paula witnessed this? Was she on the field at that time? A. Yes, she was.");

---

**15.** In their motion papers, Clarkstown Soccer Club and Arcuri state that the parties "agree that New York law applies to this case," Mem. of Law (Docket # 71) at 2 n. 1, and all of the briefs assume that New York law governs resolution of the claims. This implied consent suffices to establish the applicable choice of law. *Golden Pacific Bancorp v. F.D.I.C.,* 273 F.3d 509, 514 n. 4 (2d Cir.2001) (citation omitted).

**16.** Paula, however, denied seeing A.B. and Mark lying together in a field during the Europe trip and said that no one told her that they had seen A.B. and Mark lying together in a field. Spinella Decl. Ex. B (Paula Staropoli Depo.) at 38:6–14.

Ascher Decl. Ex. O (Gibson Depo.) at 61:13–63:4 & 77:2–6 ("I believe [Paula] was [present]. I'm not a hundred percent sure, but I believe she was."); (2) A.B. and Mark sitting next to each other on the plane ride back to the United States, which prompted Paula to yell at Mark to come sit next to her instead, *see* Spinella Reply Decl. Ex. T (Young Depo.) at 111:11–14 ("I remember [Paula] was hollering and I thought to myself, yeah, yeah. I don't really remember [Mark] sitting with [A.B.] but I do remember Paula hollering at him to come sit with me, meaning her."); Ascher Decl. Ex. A (A.B. Depo.) at 242:2–20 ("I think initially we sat next to each other and then he moved.... Because Paula was upset that he sat next to me.... I learned that later on. Q. You didn't know that at that time? A. No.... He didn't sit there for long."); and (3) A.B. sitting on Mark's lap on a sightseeing bus in London while Paula and the Staropoli daughters were present. *See* Ascher Decl. Ex. M (Schmidt Depo.) at 24:14–25:8.[17] However, these instances alone are insufficient to establish that Paula had actual or constructive notice that Mark would commit sexual assaults upon A.B.[18] Furthermore, to the extent that other witnesses observed this conduct, as well as other allegedly questionable conduct, during the Europe trip, there is no evidence that anyone ever informed Paula. Spinella Decl. Ex. B (Paula Staropoli Depo.) at 117:18–118:2 ("Q. During the trip to Europe had anyone ever come over to you, and I mean anyone, ever come over to you and discuss[ed] [A.B.'s] conduct with your husband? A. Not a [soul]. No one. Q. At any time after the Europe trip and up until January when your husband was arrested did anyone ever come up to you and say anything about the conduct of [A.B.] with your husband? A. No."); Spinella Decl. Ex. F (Young Depo.) at 114:9–11; Spinella Decl. Ex. G (Frey Depo.) at 133:5–18; Spinella Decl. Ex. E (Panayotidis Depo.) at

---

17. One of the parents on the Europe trip, Francine Frey, testified to having a conversation with Mark's daughter Amy during the trip, in which Amy complained that A.B. was "always there," meaning always at the Staropoli house—"'We come home from school and she's locked in my father's office with him. And the way she is behaving now and she's making Megan so upset .... so angry.'" Ascher Decl. Ex. D. (Frey Depo.) at 141:20–142:9. Amy told Frey that they had spoken to Mark, and he said "nothing is going on, we are being ridiculous," but Frey had "no idea" whether Amy talked to Paula about this. *Id.* at 142:17–21. Josine Young, a parent chaperone on the Europe trip, testified that while in Amsterdam, Mark's youngest daughter Krista cried to her that Mark was going to leave Paula and run off and marry A.B. *See* Ascher Decl. Ex. F (Young Depo.) at 70:13–71:5. Although Young testified that she told Krista that she had to "really talk to your mommy [Paula] about this," and Krista "acknowledged" that she did, Ascher Decl. Ex. F (Young Depo.) at 71:14–17, there is no evidence that such a conversation ever took place between Krista and Paula.

18. To the extent that a couple of witnesses testified to observing A.B. and Mark holding hands on the Europe trip, *see* Feinberg Decl. Ex. N (Gibson Depo.) at 57:10–59:10; Feinberg Decl. Ex. Q (Frey Depo.) at 122:10–14, 24–25, neither of these witnesses testified that they brought it to Paula's attention, and Paula herself did not recall observing such behavior. Spinella Decl. Ex. B (Paula Staropoli Depo.) at 38:3–5. Moreover, A.B. testified that she did not show any public displays of affection toward Mark, did not hold hands with him in public, did not put her arms around him, nor did he put his arms around her. Spinella Decl. Ex. A (A.B. Depo.) at 511:5–14; Spinella Reply Decl. Ex. P (A.B. Depo.) at 240:7–17; *but see* Spinella Reply Decl. Ex. P (A.B. Depo.) at 240:21–241:25 (A.B. remembers watching one of the games in London laying in the grass next to Mark and leaning against him; although no one said anything to A.B., she found out that other parents had witnessed that and thought "[t]hat it was unusual and that shouldn't be going on").

139:18-21; Spinella Decl. Ex. D (Fanshawe Depo.) at 81:6-9; Spinella Decl. Ex. K (Gibson Depo.) at 70:24-71:5; Spinella Decl. Ex. L (Schmidt Depo.) at 63:16-23; Spinella Decl. Ex. M (Moore Depo.) at 60:19-21; Spinella Decl. Ex. N (Chiarello Depo.) at 36:19-24.[19] In addition, Paula

19. Moreover, other than Francine Frey, who testified that she never spoke to Paula about the relationship between Mark and A.B., *see* Spinella Decl. Ex. G (Frey Depo.) at 133:5-18, there is no evidence that any of the other parents who were on the trip to Europe believed, based on their observations, that A.B. and Mark were involved in an inappropriate relationship. *See* **Ascher Decl. Ex. B (Fanshawe Depo.)** at 41:18-24 ("Kelly [my daughter] had told me that—you know—there was a lot of chitter-chatter, that maybe their relationship was inappropriate, and I said to her that—you know—I didn't see anything inappropriate, so it couldn't have been inappropriate."), 50:3-8 ("I told [my husband] that I thought there was a closeness between [A.B.] and Mark, like a father/daughter-type relationship, and she was very friendly with the Staropoli girls, and that there was talk that there was more to it than just that, and my words to my husband were that I refused to believe it. That's what I thought at the time."), 51:16-25 ("[My husband] thought there was a closeness between [A.B. and Mark], and I thought so, also like a father/daughter-type relationship, and maybe that [A.B.] was—was, infatuated with Mark, yes. Yes, that's what my husband and I felt."); **Spinella Decl. Ex. D (Fanshawe Depo.)** at 73:4-74:14 ("I never saw any inappropriate behavior. At first I thought it was a father/daughter closeness, and then I thought maybe [A.B.] could have been infatuated with [Mark]. I never ever thought that anything ever would have went on like they are saying did go on.... Q. But did anyone ever say there was any inappropriate, improper conduct going on while you were in Europe? A. Just that it was a strange relationship. I wouldn't say inappropriate, that it was strange, though, yes.... Yes, there was gibberish all week that it was a strange relationship and that they thought it was odd and that—you know—maybe something was going on, and I said that I didn't think there was."), 83:13-17 ("Q. Okay. And would it be accurate to say then that you did not suspect on the Europe trip that Mark Staropoli was engaged in sexual relations with [A.B.]? A. No, I did not suspect it."); **Ascher Decl. Ex. M (Schmidt Depo.)** at 24:22-25:2 ("And I think when we were on the bus [A.B.] came and sat on Mark's lap or something. But again, like I said, his wife was there. His kids were there. And he was the guardian. So I didn't think anything of it."); **Spinella Reply Decl. Ex. X (Schmidt Depo.)** at 17:3-8 ("[W]e were on the bus. Mark was with his wife on the bus and she was there too, [A.B.]. So why would we question anything if his wife was right there and his kids were right there, and she's acting like one of his daughters?"), 38:17-39:3 ("Q. The impression I got from your testimony was that you didn't think there was anything to be concerned about regarding Mark and [A.B.]'s behavior together on the trip because you felt that Mark was acting as a substitute parent for [A.B.]. Is that what you were trying to convey? ... A. Yes, again, because his wife was there, his kids were there."), 39:4-9 ("Q. So when you got home from Europe, would it be fair to say that you personally did not have any concerns about the relationship between Mark and [A.B.]? A, I personally would say I didn't have any concerns."); **Feinberg Decl. Ex. M (Panayotidis Depo.)** at 115:13-116:5 ("Q. In Amsterdam, did you observe any contact or anything you determined to be inappropriate going on between Mark and [A.B.]? A. No. Q. Did you observe anything in London that you thought was inappropriate or unusual going on between Mark and [A.B.]? A. No. Q. Do you recall ever seeing Mark and [A.B.] laying on a soccer field in Europe next to each other? ... A. I don't recall that, no. Q. Do you recall any of the other parents or chaperons [sic] discussing the fact that they had observed Mark and [A.B.] laying next to each other on the field? A. No."); **Spinella Decl. Ex. E (Panayotidis Depo.)** at 140:4-16 ("Q. Do you recall telling [Arcuri in August, 2004] that you didn't see anything that concerned you regarding the relationship between Mark and [A.B.]? A. Yes, I do recall that. Q. When you said that to him, did you say that because it was, in fact, true? A. It was true. I didn't see anything inappropriate."); **Spinella Decl. Ex. F (Young Depo.)** at 115:3-116:6 (Young went out to dinner a couple of weeks after the Europe trip with Turrin, Panayotidis, Moore, and Schmidt at which they discussed the conduct between A.B. and Mark; Young said "intuition was that there was inappropriate behavior" and testified that Panayotidis said that she thought the relationship between A.B. and Mark was inappropriate, but that neither Moore nor

was unaware of any criminal investigation against Mark prior to his arrest in January, 2005, nor was she aware that allegations had been made regarding Mark and A.B. in August, 2004. Spinella Decl. Ex. B (Paula Staropoli Depo.) at 45:23–46:4. Paula also testified that she was not aware that anonymous letters had been sent to Clarkstown Soccer Club about the relationship between Mark and A.B. *Id.* at 74:20–75:2, 75:21–25.[20]

■ Plaintiffs otherwise contend that Paula had actual or constructive notice that Mark would commit sexual assaults upon A.B. based on the fact that Paula was home at the time of some of the assaults that occurred in the Staropoli house. *See*

Spinella Decl. Ex. A (A.B. Depo.) at 506:8–18 (A.B. assumes that Paula and her daughters knew what was going on "[b]ecause they were aware of the way I was treated differently. They were home at the time that these acts occurred. Paula's bedroom overlooked the living room where the majority of the acts occurred, so Mark didn't do a particularly well [sic] job of trying to keep this hidden from the public, so I assume that they would know."). However, A.B.'s assumptions alone do not give rise to liability. *See Geywits ex rel. Geywits v. Charlotte Valley Cent. Sch. Dist.*, 98 A.D.3d 804, 805–06, 949 N.Y.S.2d 834 (3d Dep't 2012) (school district did not have constructive notice that sophomore would sexually assault first graders in

---

Schmidt did), 196:9–13 ("Q. And you [Young] didn't believe that [A.B.] and Mark Staropoli would do anything inappropriate? A. No. Q. Am I right? A. Correct."); **Spinella Reply Decl. Ex. W (Gibson Depo.)** at 69:13–70:13 ("Q. Would you deem your observations between the interactions of Mark and [A.B.] to be inappropriate? ... A. Inappropriate means that there would be some sexual nature behind what they were doing, in my opinion. Q. ... So based upon your opinion of inappropriate, that there was some sexual—A. No. Q. Okay. And you've also described their relationship as 'weird' and 'unusual'? A. Yes. It's not something that I would deem, ... any other parent on the team that I think would accept their daughter being in contact with Mark, whether it be touching, feeding, sitting on laps, whatever. To me, that's ... weird. If you want to call it inappropriate, feel free. But I don't—so, you know, how I deem inappropriate is a different situation."); **Spinella Reply Decl. Ex. Y (Chiarello Depo.)** at 33:10–22 ("Q. Is it your testimony here today that you did not personally observe any inappropriate conduct between Mark Staropoli and [A.B.] prior to the Europe trip? A. Yes. I didn't see any. Q. Same question during the European trip? A. Same answer. Q. Same question after the European trip? A. Same thing. I didn't really see anything that was any different than the other girls."); **Feinberg Decl. Ex. O (Moore Depo.) at** 21:3–7 ("Q. Did you see anything that, in England, during this trip, that you

would deem to be inappropriate conduct on the part of Mark Staropoli? A. I don't remember noticing anything."); *but see* **Ascher Decl. Ex. D (Frey Depo.)** at 156:21–25 (in August, 2004, as soon as they got back from the Europe trip, Frey reported Mark and A.B.'s relationship to Child Protective Services).

**20.** In Plaintiffs' Response to Paula's 56.1 Statement, they admit that Paula made these statements during her deposition, but they "den[y] the statement[s] as an undisputed material fact." Pls.' Response to Paula's 56.1 ¶¶ 22, 31–32. It appears that Plaintiffs' Response to Paula's 56.1 Statement skipped a response to Paula's paragraph 20; thus, Plaintiffs' paragraphs 22, 31, and 32 correspond to Paula's paragraphs 23, 32, and 33. In any event, Plaintiffs' denial of these statements without citation to any admissible evidence fails to raise a genuine issue of material fact. *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763, 2006 WL 2136249, at *4 (S.D.N.Y. Aug. 1, 2006) ("To the extent the plaintiffs proclaim factual assertions to be in dispute without identifying evidence in the record, the plaintiffs thwart the basic purpose of" Local Rule 56.1.); *AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De–Mar Food Serv. Inc.*, No. 06 Civ. 2142, 2007 WL 4302514, at *4 (S.D.N.Y. Dec. 7, 2007) ("unsupported denials, without more, cannot create disputes of material fact").

bathroom stall where, among other things, "the abuse allegedly happened three times over the course of several months ... the bathroom did not have an exterior door, and the bathroom was located in the main hallway, next to the superintendent's and principal's offices"). A.B. testified that the occasions on which family members were in the house when these acts occurred were mostly at nighttime, when everybody was in bed "for the most part," Spinella Decl. Ex. A (A.B. Depo.) at 506:19–24, and that the sexual misconduct would occur after Paula went to her bedroom, *id.* at 294:3–6. A.B. also testified that while most of the sexual acts occurred in the living room, some took place in the basement, which provided "more seclusion, more protection from being caught." *Id.* at 508:4–10. Moreover, A.B. testified that she took measures "to hide [her] relationship with Mark," "participate[d] in cover stories," and made "efforts to make sure ... no one would find out; no one would see what was going on." *Id.* at 510:11–18. Finally, A.B. testified that the sexual assaults did not always happen in the Staropoli house, but sometimes happened in Mark's car, when it was just the two of them. Feinberg Decl. Ex. I (A.B. Depo.) at 291:20–25 ("Q. Did it always happen at his home? A. Either his home or in his car."); *see also* Feinberg Decl. Ex. I (A.B. Depo.) at 128–33 (Mark inappropriately touched A.B. at her house); Feinberg Decl. Ex. I (A.B. Depo.) at 143:15–144:15, 583:14–24 (sexual activity occurred on an airplane returning from a trip to St. Lucia); Feinberg Reply Decl. (Docket # 91) Ex. AD (A.B. Depo.) at 251:9–11 (sexual activity occurred while A.B. was with the Staropoli family on a ski trip to Jiminy Peak); Spinella Decl. Ex. A (A.B. Depo.) at 236:20–25 (sexual activity occurred in London).

In *Jamal P.*, a child care worker at a residential facility, who was seated approximately 12 feet from Jamal's bed, discovered Jamal, then eight years old, engaged in an act of fellatio with another boy. Several days later, a child counselor discovered Jamal and a different boy engaged in inappropriate sexual behavior. In finding that, as a matter of law, the defendant was not negligent in the care and supervision of the infant plaintiff, the court explained,

> There was no indication prior to either sexual encounter that any untoward behavior was about to occur. At no time did Jamal complain to Abbott House personnel that other residents were attempting to induce him to engage in acts of sexual misconduct. The first incident involved obvious stealth, and if Jamal was not, as the evidence suggests, a willing participant, neither did he make any attempt to alert the staff member seated nearby. Because each sexual misadventure involved a different boy, the home's staff had no prior knowledge that the resident involved in the second incident might initiate a sexual encounter with Jamal ... Thus, defendant lacked "sufficiently specific knowledge or notice" of the third-party conduct that is alleged to have resulted in injury so as to cast it in liability.... Imposition of a requirement to guard against every "impulsive, unanticipated act" that might be committed by a fellow resident would represent an unreasonable burden on the facility and its personnel....

*Jamal P.*, 24 A.D.3d at 303–04, 808 N.Y.S.2d 609 (citations omitted). Likewise, in this case, the sexual assaults involved stealth and efforts to prevent others from finding out what was going on, and it would be unreasonable to expect that Paula could guard against Mark's "impulsive, unanticipated act[s]" of sexual misconduct. Moreover, "[e]ven if conduct was planned by a third party, it can still be unanticipated ... so as to constitute an intervening act breaking the causal con-

nection despite a question of fact regarding the adequacy of supervision," and a defendant is entitled to summary judgment where he or she "had no notice that the illegal actions of a third party ... could reasonably have been anticipated, rendering the abuse unforeseeable." *Geywits,* 98 A.D.3d at 806–07, 949 N.Y.S.2d 834 (citations omitted).

■ Lastly, Plaintiffs claim that Paula had actual or constructive notice that Mark would commit sexual assaults upon A.B. because Mark ejaculated most of the time either on himself or on a sheet in the basement, and Paula was the one who typically did the laundry. However, A.B.'s testimony was equivocal on this point: Mark ejaculated "[o]n himself or like when we were in the basement on a sheet that was down there. 1 really don't remember." Spinella Decl. Ex. A (A.B. Depo.) at 600:3–7. Moreover, with respect to the sheets, A.B. testified that she "never saw anyone change them while [she] was there or if they were washed." *Id.* at 600:10–11. However, she testified that Paula "and the kids were the primary laundry doers." *Id.* at 600:21–22. Mark also testified that it "wouldn't be the norm for [him] to do the wash," Ascher Decl. Ex. I (Mark Staropoli Depo.) at 115:18–19, and Paula "would clean everything," including the bedding. *Id.* at 116:6–7. Simply put, the assertion

that Paula was put on notice by alleged semen stains that may have been left on a sheet in the basement that Paula may have laundered is too speculative to give rise to liability.[21]

In sum, there is no evidence to support a claim of negligence against Paula, and her motion for summary judgment is granted.

## B. *Claims Against Clarkstown Soccer Club and Nicholas Arcuri*

Plaintiffs assert claims of negligent supervision and retention against Clarkstown Soccer Club, the Board Members and Employees of the Clarkstown Soccer Club, and Board President Nicholas Arcuri.[22]

■ "The threshold question in any negligence action is whether the alleged tortfeasor owes a duty of care to the injured party, and the existence and scope of that duty is a legal question for the courts to determine." *Sheila C. v. Povich,* 11 A.D.3d 120, 125, 781 N.Y.S.2d 342 (1st Dep't 2004) (citations omitted). With respect to the "more specific question of whether a temporary custodian has a continuing duty to protect a child from harm once that child has been returned to the custody of a parent or guardian," *id.* at 126, 781 N.Y.S.2d 342, the New York Court of Appeals in *Pratt v. Robinson,* 39 N.Y.2d 554, 384 N.Y.S.2d 749, 349 N.E.2d

---

**21.** Among the public displays of affection cited by Plaintiffs as evidence of the inappropriate relationship between A.B. and Mark was an incident at a restaurant during a Clarkstown team trip to Delaware in which A.B. was seen spoon-feeding dessert to Mark while either sitting on his lap (and next to her father L.B.) or sitting on her father L.B.'s lap. *See* pages 288–89, *infra.* Paula was not on the Delaware trip and was not aware of this incident. Spinella Decl. Ex. B (Paula Depo.) at 34:18–35:5. Thus, it did not serve to put Paula on notice that Mark would sexually assault A.B.

**22.** Plaintiffs do not make any specific allegations with respect to the Board Members and

Employees of the Clarkstown Soccer Club, and only Defendants Clarkstown Soccer Club and Nicholas Arcuri have filed a motion for summary judgment. *See* Docket # 69. In their opposition papers, Plaintiffs refer to the "Board Members & Employees of the Clarkstown Soccer Club" as one of the Defendants, *see* Pls.' Omnibus Brief in Opp. at 17, but then proceed to refer to Clarkstown Soccer Club and Nicholas Arcuri as the "Clarkstown Defendants." *Id.* at 20. In any event, the Court's analysis set forth herein applies equally to Defendant Board Members and Employees of the Clarkstown Soccer Club.

849 (1976), determined the scope of such duty in its consideration of "whether a school district should be held liable for injuries sustained by a seven-year-old student who, after alighting from a school bus and crossing two streets without misadventure, was struck by a truck while crossing a third street on the way to her home." *Id.* at 126–27, 781 N.Y.S.2d 342. In affirming the dismissal of the plaintiffs' negligence claim, the Court of Appeals explained,

> The duty owed by a school to its students, however, stems from the fact of its physical custody over them. As the Restatement puts it, by taking custody of the child, the school has "deprived (the child) of the protection of his parents or guardian. Therefore, the actor who takes custody of * * * a child is properly required to give him the protection which the custody or the manner in which it is taken has deprived him" (Restatement, Torts 2d, s 320, comment B). The school's duty is thus coextensive with and concomitant to its physical custody of and control over the child. When that custody ceases because the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases.

*Pratt,* 39 N.Y.2d at 560, 384 N.Y.S.2d 749, 349 N.E.2d 849 (citation omitted). "Since the Court of Appeals rendered its decision in *Pratt* almost 30 years ago, numerous negligent supervision cases, involving various nonpatent custodians, have reaffirmed that holding." *Sheila C.,* 11 A.D.3d at 127, 781 N.Y.S.2d 342 (collecting cases).

▮▮▮ Plaintiffs, without citation to legal support, seek to impose a duty upon

Clarkstown Soccer Club and Arcuri that is vastly overbroad. Thus, Plaintiffs assert, "Here, Plaintiff, A.B. was in the continuing custody of Clarkstown and its coach from the time that Plaintiff, A.B. began guesting, continuing through the Europe and Delaware trips until the Defendant's arrest." Pls.' Omnibus Brief in Opp. at 30. However, A.B.'s "guesting" with the Clarkstown team in June or July, 2004, before going on the trip to Europe, Feinberg Decl. Ex. I (A.B. Depo.) at 139:24–140:15, 284:18–24 (A.B. first met Turrin in June or July of 2004 "[t]hrough preparation before going to Europe, at practice during scrimmages"), amounted to attending only five or six practices or scrimmages at which A.B. conceded nothing inappropriate happened with Mark, Brennan Decl. Ex. B (A.B. Depo.) at 285:3–16 (A.B. testified that prior to the Europe trip, A.B. attended five or six practices or scrimmages at which Turrin was present; A.B. only saw Turrin those five or six times on the soccer field; and during those five or six times that A.B. saw Turrin on the soccer field, nothing inappropriate happened with Mark).[23] A.B. then tried out for the Clarkstown team in August, 2004, after returning from the Europe trip, and had her first practice with the team in mid to late September. Feinberg Decl. Ex. I (A.B. Depo.) at 139:3–25; *but see* Brennan Decl. Ex. A (Turrin Aff.) at 3 ("The girls played high school soccer during September and October of 2004 and had little contact."). But L.B. did not sign A.B.'s application to join the Clarkstown team until September 27, 2004, Feinberg Decl. Ex. W, and A.B. did not officially join the team until November 11, 2004. Feinberg Decl. Ex. K (Arcuri Depo.) at 25:3–6. Even assuming that Clarkstown Soccer

---

**23.** Although A.B. provided this testimony in response to questions concerning her relationship with Turrin, there is no evidence that A.B. participated in any practices or scrimmages in preparation for the Europe trip at which Turrin, who was the assistant coach, was not present.

Club had a duty to A.B. prior to the date on which she officially joined the team, A.B. was undoubtedly *not* within the physical custody and control of Clarkstown Soccer Club every day, or even most days, of those several months between the time when she first began guesting until Mark's arrest. Moreover, L.B. was with A.B. on the Delaware trip; thus, A.B. was within the physical custody and control of her father at the time of any alleged sexual assaults during that trip. Plaintiffs' interpretation of the scope of a nonparent custodian's duty far exceeds the limitations set forth in *Pratt.* The law simply does not recognize such a limitless duty of care. *See Sheila C.,* 11 A.D.3d at 128, 781 N.Y.S.2d 342 ("Carried to its logical conclusion, the expanded orbit of duty urged by plaintiff would have required defendants to not only return her safely to her guardians, but to then continue to monitor the adequacy of the supervision provided by her guardians and, perhaps, to provide round-the-clock surveillance.").

Furthermore, there is no evidence that on the occasions when A.B. was in fact within the physical custody and control of Clarkstown Soccer Club, *i.e.,* during practices and soccer games with the Clarkstown team, any of the sexual assaults perpetrated by Mark upon A.B. took place. *See, e.g.,* Spinella Reply Decl. Ex. AA (Nevins Depo.) at 61:9–11 ("Q. Did you ever at any Clarkstown tournaments or practices witness Mark touching [A.B.] in any manner? A. No."); Brennan Decl. Ex. B (A.B. Depo.) at 286:21–287:14 (there were between ten and twenty incidents of inappropriate contact between Mark and A.B. during the summer of 2003, and they all occurred in Mark's home); Feinberg Deck Ex. I (A.B. Depo.) at 128–33 (Mark inappropriately touched A.B. at her house while sitting on a couch covered by a blanket in front of her father, L.B.), 291:6–25 (during the school year from September, 2003, to June, 2004, the inappropriate con-

tacts between Mark and A.B. always occurred either at Mark's home or in his car); Feinberg Reply Deck Ex. AD (A.B. Depo.) at 251:9–11 (A.B. and Mark engaged in sexual activity during a ski trip that A.B. took with the Staropoli family to Jiminy Peak). To the extent that sexual activity occurred when either A.B. stayed at Mark's house or Mark picked up A.B. and drove her to his house during the time that she practiced with and later officially joined the Clarkstown team, L.B. allowed A.B. to stay at the Staropoli house and arranged for Mark to drive A.B. to the Staropoli house. Indeed, L.B. met Mark half-way to facilitate this arrangement. *See* Ascher Decl. Ex. Y (Morris County Prosecutor's Office Investigation Report and Supplemental Report). Clarkstown Soccer Club had nothing to do with the arrangement, nor did Clarkstown Soccer Club have any say in whether or not Mark was allowed access to A.B. outside of practices and games with the Clarkstown team. Rather, all such interactions were sanctioned by A.B.'s father L.B. in the exercise of his parental authority. *See id.* (Supplemental Report dated 4/8/05 at page 2: during the fall of 2004, Mark started to meet L.B. on Route 287 "to pick up [A.B.] and take her to his home. [L.B.] stated that this had occurred usually every other weekend starting during September 2004 and into December 2004. [L.B.] stated that [Mark] had his permission to take care of [A.B.] while she was in his care."). Thus, Clarkstown Soccer Club did not owe A.B. a duty of care in the instances of Mark's sexual misconduct.

 To the extent that Plaintiffs seek to impose liability upon Arcuri and Clarkstown Soccer Club for misconduct that occurred during the Europe trip, there is no evidence that Clarkstown Soccer Club sponsored or organized that trip. *See, e.g.,* Feinberg Decl. Ex. J (Arcuri Aff.) ¶ 4 ("In

July/August 2004, a group of high school students, including A.B., travelled to Europe for soccer tournaments in Holland and England. Clarkstown Soccer Club was not affiliated with this trip and did not participate in or authorize it."); Ascher Decl. Ex. H (Turrin Depo.) at 28:9–19 ("This was a, if you want to call it a tournament team. We went under Direct Kicks [sic] name so we wore uniforms that said Direct Kick.... And who supplied insurance on the girls for ... this tournament? ... Direct Kick.), 29:6–10 ("And that team then was under the supervision of what organization or entity? ... If any. I know Direct Kick."); Brennan Decl. Ex. A (Turrin Aff.) at 2 ("The Europe trip was a 'Direct Kick' trip organized by Robert Walkley."); Ascher Decl. Ex. I (Mark Staropoli Depo.) at 82:24 ("This was a Direct Kick sponsored trip."); Feinberg Reply Decl. Ex. AG (Mark Staropoli Depo.) at 102:4–10 ("Clarkstown never made up a team to go to Europe ... Direct [K]ick sponsored a tournament for boys and girls to go to Amsterdam, Holland—pardon me. Haarlem and London. Clarkstown had nothing to do with the trip."). Indeed, neither of the documents signed by L.B. in connection with the trip reference Clarkstown Soccer Club. *See* Ascher Decl. Ex. FF. Rather, the Liability Release releases "Mark Staropoli and Margie Turrin and their associates" from liability, while L.B.'s

note granting A.B. permission to participate in the trip states that A.B. will be supervised by "Mark Staropoli and Margie Turrin." *Id.* In addition, there is no evidence that either Mark or Turrin were acting as agents and/or employees of Clarkstown Soccer Club when they undertook to supervise the Europe trip. Thus, there is no basis for a claim of negligent supervision against Clarkstown Soccer Club based on events that occurred during the Europe trip.[24]

■■■■ In any event, to the extent that Plaintiffs seek to impose liability upon Clarkstown Soccer Club and Arcuri on a theory of negligent supervision or retention,

> in addition to the standard elements of negligence, a plaintiff must show: (1) that the tortfeasor and the defendant were in an employee-employer relationship[25]; (2) that the employer "knew or should have known of the employee's propensity for the conduct which caused the injury" prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir.2004) (citations omitted). In this case, there is no evidence that Clarkstown Soccer Club knew or should have known of Mark's propensity to engage in

---

24. Plaintiffs intimate that Clarkstown Soccer Club was involved in organizing and sponsoring the Europe trip based on Walkley's testimony that he told Pete Patrikis, one of the members of the Clarkstown Soccer Club Board, that the girls team had to get the Board's permission to travel. *See* Ascher Decl. Ex. L (Walkley Depo.) at 112:23–113:25. However, Walkley further testified that he had no recollection of a conversation with either Turrin, Staropoli, or Patrikis in which any of them told him that the Board had given permission for the team to travel, nor did Walkley have the impression that the team had gotten such permission. Feinberg Reply

Deck Ex. AF (Walkley Depo.) at 114:18–116:12. Thus, there is no evidence to substantiate this theory of liability.

25. Arcuri testified that all Clarkstown Soccer Club coaches, including Mark, were paid as independent contractors. Ascher Decl. Ex. Q (Arcuri Depo.) at 109:14–15. Although Plaintiffs cite Mark's deposition testimony for the proposition that he was paid by Clarkstown Soccer Club for his training and coaching, *see* Plaintiffs' Counterstatement of Undisputed Material Facts (Docket # 89–3) ¶ 95, there is no such testimony on the cited deposition page.

sexual misconduct with a minor before A.B. began "guesting" with the Clarkstown team prior to going on the Europe trip. *See* Feinberg Decl. Ex. J (Arcuri Aff.) ¶ 5 ("Prior to this trip, no one had reported any suspicions about Staropoli and/or plaintiff to Clarkstown."). Indeed, Plaintiffs admit that "[p]rior to the trip to Europe in July/August, 2004, no one informed Clarkstown of any behavior by Staropoli that indicated a propensity to engage in sexual acts with a minor." Pls.' Responses to Joint 56.1 ¶ 29. A claim for negligent supervision cannot succeed "without evidence of any prior conduct similar to the unanticipated injury-causing act." *Brandy B. v. Eden Cent. Sch. Dist.*, 15 N.Y.3d 297,

302, 907 N.Y.S.2d 735, 934 N.E.2d 304 (2010); *see also id.* ("[U]nanticipated third-party acts causing injury upon a fellow student will generally not give rise to a school's liability in negligence absent actual or constructive notice of prior similar conduct. [I]t must be established that school authorities had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated.") (internal quotation marks and citations omitted).[26]

Furthermore, upon receiving the anonymous letters in August, 2004, after the Europe trip, Arcuri contacted an attorney

---

**26.** Plaintiffs argue that Clarkstown Soccer Club, Arcuri, and Walkley were on notice "of issues arising from inappropriate contact between coaches and underage female players and more specifically, a prior incident involving a coach's presence in an underage player's hotel room." Pls.' Omnibus Brief in Opp. at 21–22. The Board Minutes of the December 10, 2003, meeting at which this issue was discussed state as follows:

> Discussion ensued about certain allegations of inappropriate behavior by a couple of travel team coaches. The first involved allegations by certain female players concerning the actions of a certain individual in his capacity as coach of a female soccer team at a local public high school. It is believed that the public school authorities are conducting an investigation. Subject to consultation with CSC attorney Chris Ingrassia, the travel team coach will continue with his responsibilities for CSC pending the conclusion of the high school's investigation or any action by the CSC Board. A Board member also advised that he was contacted by a mother of a travel team player who told him that she believed that a female player on her daughter's team stayed in the same hotel room as a certain coach and his daughter (also a player on the team). Certain members of the CSC Board will address these allegations with the travel team coach.

Ascher Decl. Ex. DD.

Neither of these incidents involved behavior similar to that engaged in by Mark. The first involved allegations of unspecified "inappro-

priate behavior" by the travel team coach "in his capacity as coach of a female soccer team at a local public high school," not in his capacity as a coach for Clarkstown Soccer Club. Moreover, this alleged behavior was being investigated by the school. In the second alleged incident, a female player actually stayed, presumably overnight, in the same hotel room as the coach, and she was not alone with the coach, but rather, was with the coach's daughter as well. In this case, there is no allegation that A.B. ever actually stayed overnight in the same hotel room as Mark, either alone or with his daughters. Moreover, there is no indication in the Board Minutes that the second incident involved any sexual misconduct on the part of the coach. Therefore, there is no basis to conclude that these allegations put Clarkstown Soccer Club, Arcuri, and Walkley on notice that a coach would sexually assault a player on several occasions during the course of a tournament trip, or over a period of months during which a player either guested for, or a was a member of, a Clarkstown Soccer Club team. Moreover, the Board Minutes do not reveal the identity of either of the coaches in question, and Plaintiffs provide no evidence that either incident involved Mark. Defendants knowing generally of the possibility that there could be an issue with respect to coaches engaging in misconduct with players, does not establish their liability with respect to the particular misconduct engaged in by Mark.

to obtain legal advice and proceeded to interview a few of the adults who had gone on the trip, as well as Mark and L.B.[27] *See* Ascher Decl. Ex. Q (Arcuri Depo.) at 54–55 (the first thing Arcuri did after receiving the first anonymous letter was call attorney Chris Ingrassia; a few days later, Arcuri called Turrin[28]), 60–61 (Arcuri spoke to Patty Panayotidis[29], spoke to Ingrassia again, then called Mark), 67 (Arcuri spoke to Josine Young[30]). During Arcuri's telephone conversation with Mark, Mark denied the allegations of inappropriate behavior with A.B. during the Europe trip. *Id.* at 61:9–23; *see* Feinberg Decl. Ex. K (Arcuri Depo.) at 63:10–16 ("Well, his reaction—well, I guess we got to dis-

cussing the letters and his reaction was all this is, basically, made up and he led me to believe it was made up by a woman that he also led me to believe he was having an affair with. . . . That woman would be Francine Frey."). During Arcuri's conversation with L.B., L.B. told Arcuri that "he and the Staropoli family were very friendly, that Mark has known the family for six or so years. [L.B.] characterized the entire incident as 'horse shit'. . . He also led [Arcuri] to believe that [L.B.] believed that these were allegations made by Francine Frey, who he thought was unstable. . . . [L.B.] gave the very same information to the Orangetown Police.[31] It may have been the night before [Arcuri] spoke to

27. Arcuri commenced his investigation after receiving the first anonymous letter, which was sent directly to his home. Ascher Decl. Ex. Q (Arcuri Depo.) at 53, 80. Four more anonymous letters followed which were addressed to Clarkstown Soccer Club and sent to the Club's post office box. *Id.* at 80. Arcuri did read these additional letters, and he testified that he "was just going to continue the investigation [he] was currently doing and [he doesn't] remember the exact time sequence." *Id.* at 80:21–23.

28. Arcuri testified that first he asked Turrin whether Mark did anything on the Europe trip that would cause her concern, to which she replied "no," and then Arcuri asked Turrin about the specific allegations set forth in the anonymous letter and whether she observed any of the alleged misconduct, and Turrin replied "no" with respect to all of the allegations. *See* Spinella Decl. Ex. C (Arcuri Depo.) at 55:9–25.

29. *See* Spinella Decl. Ex. E (Panayotidis Depo.) at 140:4–16 ("Q. Do you recall telling [Arcuri in August, 2004] that you didn't see anything that concerned you regarding the relationship between Mark and [A.B.]? A. Yes, I do recall that. Q. When you said that to him, did you say that because it was, in fact, true? A. It was true. I didn't see anything inappropriate."); Feinberg Decl. Ex. K (Arcuri Depo.) at 59:17–60:5 ("The conversation [with Panayotidis] was very short, because she didn't want to talk to me, but she did say she saw . . . Mark leave—I don't know if it

was specifically [A.B.'s] room or one girl's room. I think she also said he was in many of the girls' rooms at various times. . . . [To me, this was not] unusual. He is the coach. I mean I think . . . it depends on the circumstance—you know—time of day, reason for doing that—you know—when you are getting a team ready to play, and three—at least two of the players, two of them were his daughters.").

30. Young had served as a parent chaperone on the Europe trip. *See* Feinberg Deck Ex. P (Young Depo.) at 206:20–207:12 (Young and Turrin were the chaperones for the girls team); Brennan Decl. Ex. B (A.B. Depo.) at 300:16–18; Feinberg Deck Ex. L (Turrin Depo.) at 125:21–25. Arcuri testified that when he asked Young about the specific allegations set forth in the letter, "[h]er response also was there was [sic] awkward moments, but no observation of any of the allegations that were mentioned." Spinella Deck Ex. C (Arcuri Depo.) at 56:21–25.

31. On August 3, 2004, an anonymous call was made to the New York State Department of Social Services Child Abuse Hotline, which was referred to the Orangetown Police Department, alleging that Mark and A.B. were involved in a sexual relationship. *See* Brennan Deck Ex. C; Ascher Decl. Ex. X. During her deposition, Frey admitted that she was the one who made this phone call. *See* Ascher Decl. Ex. D (Frey Depo.) at 156:21–25.

him or a few nights before [Arcuri] spoke to him, and [L.B.] led [Arcuri] to believe there was no credibility to any of the allegations." Spinella Decl. Ex. C (Arcuri Depo.) at 68:15–69:2.[32] As a result of his conversations with L.B., and the Orangetown Police, Arcuri discontinued his investigation of the allegations, and thus did not end up speaking to some of the other parents on the Europe trip, such as Fatima Schmidt and Deborah Moore. *Id.* at

67:22–68:10. The Board of the Clarkstown Soccer Club had a meeting on September 15, 2004, at which the investigation into the allegations concerning A.B. and Mark was discussed. Ascher Decl. Ex. Q (Arcuri Depo.) at 86.[33] The Board directed Arcuri to have a second conversation with Mark, and Arcuri spoke to Mark again, informing Mark that the Board wanted Mark "to continue to act in a manner where there was no perception of any inappropriate

32. L.B. testified that the day after he picked up A.B. following the Europe trip, the police called and told him that they were investigating a complaint about A.B. and Mark having a relationship. Spinella Decl. Ex. I (L.B. Depo.) at 90. L.B. told the police that he could not believe this allegation. *Id.* at 92. The night that he got the phone call from the police, L.B, went to the police station and was there for a couple of hours with A.B. and Mark. *Id.* at 94. L.B. testified that he called Mark on his way up to the police station and told Mark that he had just gotten a call from the police about A.B. and Mark having a relationship and that he was "on [his] way up there to have it checked out." *Id.* at 94:20–95:4. L.B. said that Mark "completely denied that there was anything going on as did [A.B.]." *Id.* at 95:6–7.

L.B. said he subsequently spoke to Arcuri and told him that the allegation of a relationship between A.B. and Mark was a "bunch of horse shit": "I got a phone call from, I believe it was Nick [Arcuri], and this was after the police had investigated, you know, and talked to me and talked to my daughter and talked to Mark, and essentially conveyed that there wasn't—they didn't see anything going on. And they had called me thereafter and it was, like, you know, here we go through this whole thing again and, you know, that was my impulsive, frustrated, you know, response to it." *Id.* at 93:9–25. L.B. noted that during that conversation, he did not ask Arcuri to limit in any way Mark's involvement with Clarkstown Soccer Club. Feinberg Reply Decl. Ex. AC (L.B. Depo.) at 143:21–24.

L.B. also testified that sometime in August or September, 2004, he received from Clarkstown Soccer Club copies of at least some of the anonymous letters that had been sent to the Club. *Id.* at 135–37. L.B. said that one of the letters indicated that there was a relation-

ship between Mark and a young female on the Europe trip, and L.B. understood that letter to be referring to A.B. *Id.* at 136:15–22. L.B. testified that after receiving these letters, he spoke to both Mark and A.B. *Id.* at 137:2–9. L.B. stated that in August or September, 2004, after having seen the anonymous letters, having spoken to Mark, having spoken to A.B., and having spoken to the police, he "felt secure in the knowledge or the belief that there was nothing going on sexually between A.B. and Mark." *Id.* at 142:25–143:8.

33. Arcuri testified that the Board meeting took place on September 14, 2004, but the Board Minutes state that the meeting took place on September 15. *See* Ascher Decl. Ex. DD. The Board Minutes provide the following report:

Nick [Arcuri] reported that he had received several anonymous letters alleging sexual misconduct involving a CSC coach (Mark Staropoli) while on a European soccer tournament in which the Club did not participate and the team involved did not play under the Club's name. Nick indicated that he immediately investigated the matter by speaking with a couple of chaperones, the coach, and the young lady's father. The father advised Nick that there was "nothing" to the allegations and that he and the coach had reviewed the matter with the Orangetown police. The chaperones also advised Nick that there did not appear to be a basis for the allegations. After some discussion among the members of the Board, Nick agreed to speak again to the coach advising him that he needs to be extra sensitive about such matters and to actively seek to introduce separation between himself and the player to assure that there is no misperception of any misbehavior.

behavior or any wrongdoing." *Id.* at 86:17–87:10.

The Court sees no reason, and Plaintiffs provide none, why Clarkstown Soccer Club and Arcuri were not entitled to rely on the outcomes of both their own and the Orangetown Police Department's investigations, nor do Plaintiffs provide legal support for the notion that Clarkstown Soccer Club and Arcuri acted unreasonably under the circumstances. Plaintiffs suggest not only that Arcuri and Clarkstown Soccer Club should have done a more thorough investigation, but that the only conclusion that they could have reached as a result thereof was that Mark and A.B. were involved in an inappropriate relationship. *See* Pls.' Omnibus Brief in Opp. at 34 ("Clarkstown refused to properly weigh the facts with which it had been presented, and took no remedial action at all.") & 35 ("Clarkstown cannot avoid responsibility since it simply did not adequately investigate the allegations."), however, as detailed in footnote 19, *supra*, almost none of the other parents who were on the trip to Europe believed, based on their observations, that A.B. and Mark were involved in an inappropriate relationship.

In addition, when Arcuri received an email from a Clarkstown parent, Chris Inanc, dated October 27, 2004, alleging that Mark was dismissed as a coach at Northern Valley High School because he was having an affair with a 15-year-old girl, Arcuri contacted the school's athletic director. In a telephone conversation that took place on November 1, 2004, the athletic director told Arcuri that "he had no evidence or allegations" about an affair between Mark and a 15-year-old girl. Feinberg Decl. Ex. K (Arcuri Depo.) at 79:14–19; *see* Ascher Decl. Ex. V at 5

(Arcuri's handwritten notes regarding conversation with athletic director of Northern Valley High School). In addition, following receipt of the email from Chris Inanc, Arcuri contacted the Orangetown Police Department and provided them with the anonymous letters that had been sent to him and Clarkstown Soccer Club. Spinella Decl. Ex. C (Arcuri Depo.) at 82:16–24. As Arcuri explained,

> [L.B.] and Mark both told me they were called down, that [L.B.] and [A.B.] were called down to the Orange Police and they found no wrongdoing, no criminal act, but after Chris' letter, she was the first parent that put her name to something.
>
> Up until that point all I had was anonymous letters and parents saying they didn't see any wrongdoing. She was the first one. Again, my understanding she wasn't on the Europe trip. She was the first one to at least put her name and say, "I think there is some wrongdoing here."
>
> I said, "You know what, to satisfy my own conscious [sic], let me contact the Orangetown Police."
>
> At this point the only thing I know I am taking Mark and [L.B.'s] word that they were down there and no reason not to believe them.
>
> So I contacted ... Detective Nawoichyk ...
>
> I said, "I have these five letters."
>
> They said, "We are aware of it."
>
> Finally he said, "Look, we did an investigation. We found no criminal behavior."
>
> And that was, basically, where I left it. . . .

*Id.* at 82:25–83:25.[34]

*Id.* at 1.

**34.** The chronology of events is a bit unclear. Although Arcuri testified at his deposition that he contacted the police after receiving Chris Inanc's October 27, 2004, email, Arcuri stated in an affidavit submitted in support of this motion, "Upon receipt of anonymous allega-

As has been said in the school setting, "a negligent retention theory is not viable in a sexual abuse case, unless the school had notice of prior allegations of a teacher's inappropriate contact with a student and failed to investigate the allegations." *CM. v. City of New York*, 9 Misc.3d 251, 254, 800 N.Y.S.2d 898 (N.Y.Sup.2005) (citations omitted). Furthermore, in a case involving a "rumor" of a sexual encounter between a school employee and 15–year–old girl, where school administrators "immediately conducted an investigation, which included interviewing [the girl], [the employee], the reporting student and the classmate who was present during the alleged conversation" about the sexual encounter, the court granted summary judgment to the school on the claim of negligent retention. *Ernest L. v. Charlton Sch.*, 30 A.D.3d 649, 651, 817 N.Y.S.2d 165 (3d Dep't 2006). Both the employee and the girl "vehemently denied the 'rumor,'" and the other two students who were interviewed failed to provide substantiation for the rumor. *Id.* at 651–52, 817 N.Y.S.2d 165. In granting summary judgment, the court noted that the school "fully investigated the matter and came to the reasonable conclusion based on the evidence then before it that it was unfounded." *Id.* at 652, 817 N.Y.S.2d 165. In this case, Arcuri and Clarkstown Soccer Club investigated the allegations that they received regarding Mark; the allegations were completely denied by Mark and by A.B.'s father, L.B., and none of the other witnesses who were interviewed were able to substantiate the allegations. The Orangetown Police likewise investigated the allegations and informed Arcuri that

they found no evidence of criminal wrongdoing. Thus, Clarkstown Soccer Club and Arcuri reasonably concluded that the allegations were unfounded.

The only incident cited by Plaintiffs after the Europe trip, which was witnessed by some parents and which Plaintiffs claim provided notice of Mark's propensity to engage in sexual misconduct with A.B., was during a tournament in Delaware over Thanksgiving weekend in 2004. The Clarkstown team, along with team members' parents, went out to dinner one night at a Hooters Restaurant, and A.B. was seen spoon-feeding dessert to Mark while either sitting on his lap (and next to her father L.B.) or sitting on her father L.B.'s lap. *See* Ascher Decl. Ex. F (Young Depo.) at 120:8–17 ("I saw [A.B.], she was sitting on [Mark's] lap and he would feed her when we went out to dinner as [a] group. Q. How many times did you see this? A. Once ... at Hooters. We went to Hooters, and the girls and the parents, and we all ate in a little side room, and [A.B.'s] father was sitting right next to her.")[35]; Ascher Decl. Ex. O (Gibson Depo.) at 16:3–18:18 (A.B. was sitting on Mark's lap, and L.B. was in "close proximity"); Ascher Decl. Ex. D (Prey Depo.) at 128:1–14 ("[S]he sat on her father's lap and spoon fed Mark") & (Frey Depo. Cross) 12:20–15:25; Ascher Decl. Ex. E (Nevins Depo.) at 56:8–17 ("Q. Do you recall her sitting on her father's lap feeding Mark? A. Yes."). Given L.B.'s presence, this incident provides no basis for liability as against Clarkstown Soccer

tions of misconduct involving Mark Staropoli and A.B. in August 2004, I consulted with legal counsel for the club and reported the allegations to the police. The police informed me that they interviewed witnesses, including A.B.'s father, L.B., and Mark Staropoli, both of whom denied the anonymous allegations of sexual impropriety. The police told me that they conducted an investigation and that they found 'no evidence of criminal wrongdoing.'" Feinberg Decl. Ex. J (Arcuri Aff.) ¶ 2.

**35.** Young later testified that she did not recall whether A.B. was sitting on Mark's lap or L.B.'s lap during this incident. *See* Feinberg Decl. Ex. P (Young Depo.) at 202:9–12.

Club since A.B. was within the physical custody and control of her father at the time, and he took no issue with this conduct. *See Pratt*, 39 N.Y.2d at 560, 384 N.Y.S.2d 749, 349 N.E.2d 849 ("The school's duty is thus coextensive with and concomitant to its physical custody of and control over the child. When that custody ceases because the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases."); *Mary KK. v. Jack LL.*, 203 A.D.2d 840, 841–42, 611 N.Y.S.2d 347 (3d Dep't 1994) ("It is well established that a school district has the duty to exercise the same degree of care and supervision over the pupils under its control as a reasonably prudent parent would exercise under the same circumstances. The standard for determining whether this duty was breached is whether a parent of ordinary prudence placed in the identical situation and armed with the same information would invariably have provided greater supervision.") (citations omitted); Ascher Decl. Ex. D (Frey Depo. Cross) at 15:8–16 ("Q. What did you think was happening other than [A.B.] putting food in [Mark's] mouth? A. It was inappropriate. Uncomfortable and inappropriate.... Q. Did it appear uncomfortable for [L.B.]? A. No."); Ascher Decl. Ex. F (Young Depo.) at 186:2–3 ("Q. What was [L.B.'s] reaction? A. He had no reaction."); Ascher Decl. Ex. O (Gibson Depo.) at 18:7–10 ("And that was another topic that we all said, like, I mean, this guy's sitting here, watching his daughter sitting on this guy's lap and he doesn't find that odd?"); Feinberg Decl. Ex. S (L.B. Depo.) at 156:5–10 ("Q. Okay. And you said that there are times when [A.B.] sits on your lap. A. That's correct. Q. And there's nothing wrong with that, is there? A. I don't know what other people's values are, but in my value there is

none. Q. . . . [A]s you sit here now, do you recall ever having seen [A.B.] putting food in Mark's mouth? A. I don't recall seeing that."). Plaintiffs allege no instances of sexual misconduct after the Thanksgiving weekend tournament that occurred while A.B. was within Clarkstown Soccer Club's custody and control.

Lastly, in order to state a claim for negligent supervision or retention, the tort must have been "committed on the employer's premises." None of the alleged incidents of sexual misconduct occurred in locations linked in any way to Clarkstown Soccer Club.

Accordingly, the motion for summary judgment on behalf of Clarkstown Soccer Club and Arcuri is granted.

## C. *Claims Against Margaret Turrin*

Plaintiffs assert a claim of negligence against Margaret Turrin based on the assertion that Turrin stood *in loco parentis* to A.B. and had a duty to protect A.B. during the times when A.B. was in Turrin's care.

Turrin was the assistant coach of the Clarkstown girls soccer team coached by Mark. Brennan Decl. Ex. A (Turrin Affidavit); Spinella Decl. Ex. J (Turrin Depo.) at 20:2–25; Ascher Decl. Ex. I (Mark Staropoli Depo.) at 15:16–17 (Turrin was general manager and assistant coach); Ascher Decl. Ex. N (Moore Depo.) at 16:5–6. She also served as a chaperone for the girls' team that went on the Europe trip. Ascher Decl. Ex. H (Turrin Depo.) at 159:10–11. The permission slip provided by L.B. for A.B. to participate in the Europe trip stated that the team "will be supervised by Mark Staropoli, and Margie Turrin," and L.B. signed a liability release form, releasing "Mark Staropoli and Margie Turrin and their associates form [sic] any and all liability arising from injury or injuries sustained by my child while participating in

the trip's activities." Ascher Decl. Ex. FF.

■ There is no evidence that A.B. had any kind of relationship with Turrin until the summer of 2004, when A.B. first began "guesting" with the Clarkstown team, *i.e.*, practicing with the team occasionally and scrimmaging with them once, before going on the trip to Europe. Feinberg Decl. Ex. I (A.B. Depo.) at 139:24–140:15, 284:18–24 (A.B. first met Turrin in June or July of 2004 "[t]hrough preparation before going to Europe, at practice during scrimmages"). Thus, A.B. testified that during her time in London, her relationship with Turrin "was limited" because she "was new to the team ... [Turrin] really didn't know me, and I didn't know her ... other than discussing meal times and practice times, we *really* didn't talk much." Brennan Decl. Ex. B (A.B. Depo.) at 308:3–7. L.B. signed A.B.'s application to join the Clarkstown team on September 27, 2004, Feinberg Decl. Ex. W, and A.B. officially joined the team on November 11, 2004. Feinberg Decl. Ex. K (Arcuri Depo.) at 25:3–6. Other than the duration of the Europe trip, however, there is no evidence that any of the sexual assaults perpetrated by Mark upon A.B. occurred at times when A.B. was within the physical custody and control of Turrin, *i.e.*, during practices and soccer games with the Clarkstown team at which Turrin served as the assistant coach, *See, e.g.*, Brennan Decl. Ex. B (A.B. Depo.) at 285:3–16 (prior to the Europe trip, A.B. attended five or six practices or scrimmages at which Turrin was present; A.B. only saw Turrin those five or six times on the soccer field; and during those five or six times that A.B. saw Turrin on the soccer field, nothing inappropriate happened with Mark). Thus, Turrin did not owe A.B. a duty of care in any instances of Mark's sexual misconduct that occurred outside of the Europe trip. As previously noted, any inappropriate behavior that occurred during the November, 2004, Delaware trip does not give rise to liability, since L.B. was on that trip with A.B.

As explained in Section II.A., *supra*, "A person, other than a parent, who undertakes to control, care for, or supervise an infant, is required to use reasonable care to protect the infant over whom he or she has assumed temporary custody or control.... [S]uch an individual is obliged to provide adequate supervision and may be held liable for foreseeable injuries proximately resulting from the negligent failure to do so." *Appell*, 296 A.D.2d at 514, 745 N.Y.S.2d 491. However, where a claim of negligence is brought against a party based on a failure to protect a minor against alleged sexual assaults by a third party, the infant plaintiff must establish that the defendant "was provided with actual or constructive notice that such assaults might be made upon the infant plaintiff." *Jamal P.*, 24 A.D.3d at 303, 808 N.Y.S.2d 609. As explained in a case in which claims asserted against a school district based on a teacher's acts of sexual misconduct with a student were dismissed, "The harm posed by the teacher's proclivities to engage in inappropriate sexual conduct with students was not known or foreseeable at the time these incidents happened. Without such knowledge, there would have been no reason for a parent of ordinary prudence to prevent his or her child from meeting privately with the teacher during school hours...." *Mary KK.*, 203 A.D.2d at 842, 611 N.Y.S.2d 347 (citation omitted). In this case, there is no evidence that Turrin had either actual or constructive notice that Mark would sexually assault A.B. either at the time that she first began guesting with the Clarkstown team or when she signed up to participate in the trip to Europe. Plaintiffs even admit that "[p]rior to the trip to Europe in July/August, 2004, no one informed Turrin of any behavior by Staropoli that indicated a pro-

pensity to engage in sexual acts with a minor." Pls.' Responses to Joint 56.1 ¶ 30; *see* footnote 14, *supra.* Without knowledge of Mark's proclivities to engage in inappropriate sexual conduct with minors on his team, Turrin had no reason to guard against A.B. being alone with Mark either at Clarkstown team practices or games (although there is no evidence that any of the sexual misconduct occurred at practices or games) or during the Europe trip.

 A couple of witnesses testified that during the Europe trip, they discussed with Turrin the alleged relationship between A.B. and Mark. Josine Young, another of the chaperones on the Europe trip, testified that while in Amsterdam, she told Turrin about a conversation that Young had had with Mark's youngest daughter Krista, in which Krista said that Mark was going to leave Paula and run off and marry A.B. *See* Ascher Decl. Ex. F (Young Depo.) at 71:3–72:5. Young also testified about a conversation that she had in London with Turrin and another parent, Francine Frey, in which Frey stated that "she had been replaced by a 16 year old," explaining that Frey had been in a relationship with Mark, and identifying A.B. as the 16 year old. *Id.* at 80:1–81:5. However, according to Young, neither she nor Turrin asked Frey why she thought she was being replaced by A.B. *Id.* at 81:10–15. Young also testified that she spoke to Turrin about the instance in which A.B. and Mark were lying down next to each other in the soccer field. *Id.* at 97:17–24 ("I said [to Turrin] this doesn't look good. What is going on here.... She agreed."). Frey testified that during the middle of the second week of the two-week trip she spoke to Turrin about the relationship between Mark and A.B. Ascher Decl. Ex. D (Frey Depo.) at 138, 229–30. Frey testified that she told Turrin that Mark's daughter Amy was " 'very upset about Marks [sic] behavior and what's going on' " and Mark's daughter Megan was "very angry," *Id.* at 231:1–3. Frey said that in response, Turrin said, "I know. We all know what's going on. And I think she was kind of like trying to figure out how to deal with it without making it bigger than it was." *Id.* at 231:7–10; *see id.* at 138:16–20 (Frey said that with respect to the relationship between A.B. and Mark, she asked Turrin, "[W]hat is this? Why is this going on[?] And everyone is dancing around and skating around it. And what are you going to do? And Margie was besides herself."). According to Frey, Turrin was aware of the "laying in the grass, the holding hands going down to the field," although Frey did not know if Turrin specifically said that she saw Mark and A.B. holding hands. *Id.* at 231:16–22. Frey also testified that Turrin was aware of "what we perceived to be a relationship" between Mark and A.B. *Id.* at 138:21–25. However, Frey went on to state, "I don't know if there was truly [a relationship] or this was a lot of, you know, silliness." *Id.* at 139:2–3.

Turrin herself testified that two parents, Debbie Moore and Fatima Schmidt, told her that they had seen Mark coming out of A.B.'s dorm room in London, but that Turrin did nothing after receiving this information since A.B. "was injured. [Mark] explained to them that he had gone in to check on her injury." Ascher Decl. Ex. H (Turrin Depo.) at 51:10–52:24 [36]; *see also* Ascher Decl. Ex. N (Moore Depo.) at 67:2–9 ("And Mark—was [A.B.] had hurt some-

---

**36.** A.B. testified at her deposition that during the team's stay in London, after dinner, she "probably hung out with the girls on the team for a little bit and then went back to my room to rest. I had hurt my leg by the time I got to London. I pulled one of the quad muscles, so I was in pain and not very mobile, so I was tired." Spinella Decl. Ex. A (A.B. Depo.) at 310:21–311:3.

thing, her leg or something. And I was sitting next to Fatima, I think, in the hallway. And he came out, and Fatima and I kind of—we looked at each other and we looked at him, and he said something about her leg. He was checking on her leg. She had hurt her leg, I think that's what he said.").[37] Schmidt also testified that during the Europe trip, there was an instance where A.B.'s head was in Mark's lap while they were waiting at the airport, and that Turrin was there when this happened. Ascher Decl. Ex. M (Schmidt Depo.) at 56:3–24.

However, there is little evidence that the other parents on the trip either thought that this behavior was inappropriate or sought to complain to Turrin about it. *See* Spinella Decl. Ex. F (Young Depo.) at 196:14–20 ("Q. Now, the next incident I believe was the dorm and the parents said they saw Mark go into the dorm, am I right? A. Yes. Q. And you didn't think at that time there was anything inappropriate, did you? A. No."); Spinella Reply Decl. Ex. W (Gibson Depo.) at 62:12–63:17 ("Q. Did you see them doing anything inappropriate, other than lying down? A. No Did I point it out to anybody? No.... The whole team was laying right there. Everybody saw it.... All of the parents that were on the trip.... Margie Turrin ... was definitely there. Q. And did you overhear anyone complain to Margie Turrin? A. Not that I'm aware of, no."). One of the parents testified that he observed A.B. and Mark holding hands on the Europe trip, but he acknowledged that he did not tell Turrin about it. Feinberg Decl. Ex. N (Gibson Depo.) at 59:14–16. When Moore was asked whether she recalled "any conversations about any inappropri-

ate conduct at which Margie Turrin was present," Moore responded, "No, I don't think she was there." Feinberg Decl. Ex. O (Moore Depo.) at 21:21–24. As detailed in footnote 19, *supra*, almost none of the other parents who were on the trip to Europe believed, based on their observations, that A.B. and Mark were involved in an inappropriate relationship, and Turrin herself denies that she ever saw any inappropriate behavior between A.B. and Mark during the trip. Brennan Decl. Ex. A (Turrin Aff.) at 3. As noted above, a nonparent custodian has a duty to protect against "foreseeable injuries proximately resulting from the negligent failure to" provide adequate supervision. *Appell*, 296 A.D.2d at 514, 745 N.Y.S.2d 491; *see also Brandy B.*, 15 N.Y.3d at 302, 907 N.Y.S.2d 735, 934 N.E.2d 304 ("[U]nanticipated third-party acts causing injury upon a fellow student will generally not give rise to a school's liability in negligence absent actual or constructive notice of prior similar conduct. [I]t must be established that school authorities had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated.") (internal quotation marks and citations omitted). Based on the information known to Turrin at the time, it was not foreseeable that Mark would sexually assault A.B. during the Europe trip. Therefore, Turrin cannot be held liable for any failure to act during the trip. *See Schrader v. Bd. of Educ. of Taconic Hills Cent. Sch. Dist.*, 249 A.D.2d 741, 743, 671 N.Y.S.2d 785 (3d Dep't 1998) ("[P]laintiffs have made no showing that school personnel were possessed of any knowledge or notice as to the risk of physi-

---

**37.** Moore explained her reaction to seeing Mark come out of A.B.'s room as follows: "Fatima and I just looked at each other. But this was after the rumors, after I think I heard something, after I had heard the thing about Francine. And I think we looked at each other and, you know, just thought, oh Q. Did it seem unusual to you? A. Only because of, you know, what we ... had heard." Ascher Decl. Ex. N (Moore Depo.) at 68:15–25.

cal or sexually assaultive behavior by the two boys involved. Nothing in their behavioral histories prior to this incident ... provides a sufficient basis upon which to find that the school was put on actual or constructive notice of any violent or assaultive tendencies or behavior on their part. While it is true that these issues generally present questions of fact, there must be some foundation upon which the question of foreseeability of harm may be predicated, *i.e.*, at least a minimal showing as to the existence of actual or constructive notice.") (citation omitted).

As detailed in Section II.B., *supra*, after the Europe trip, once allegations of an inappropriate relationship between Mark and A.B. surfaced in anonymous letters sent to Arcuri and Clarkstown Soccer Club in August, 2004, Arcuri interviewed a few of the adults who had gone on the trip, including Turrin, as well as Mark and L.B., and ultimately referred the matter to the Orangetown Police Department, which had already conducted an investigation but concluded that there was no evidence of criminal behavior. Turrin claims that shortly after returning from the Europe trip, she "learned that the Clarkstown Police [sic] met with L.B., A.B., and Mark Staropoli. L.B. called the allegations 'horse shit.' No charges were ever brought at that time." Brennan Decl. Ex. A (Turrin Aff.) at 3. As with Clarkstown Soccer Club and Arcuri, Plaintiffs provide no legal justification for the contention that Turrin was not entitled to rely on the outcomes of these investigations or that Turrin acted unreasonably under the circumstances. Even if Turrin had become aware during the Europe trip of the possibility of an inappropriate relationship between A.B. and Mark, these post-trip investigations satisfied any duty Turrin may have owed to A.B. as the assistant coach for A.B.'s Clarkstown Soccer Club team to protect A.B. from foreseeable harm.[38]

Accordingly, Turrin is entitled to summary judgment on Plaintiffs' claims against her.

**D. *Claims Against Direct Kick Soccer and Robert Walkley***

 With respect to Direct Kick Soccer and Robert Walkley, Plaintiffs allege that as the organizers of the trip to Europe in the summer of 2004, they are liable for Mark's sexual misconduct perpetrated during the second week of that trip, when the teams were in England. However, there is no evidence that Direct Kick Soccer and/or Walkley owed a duty to A.B. during the Europe trip, since they never exercised physical custody and control over her. "In the absence of duty, there is no breach and without a breach there is no liability." *Sheila C.*, 11 A.D.3d at 126, 781 N.Y.S.2d 342 (internal quotation marks, alteration, and citations omitted). In this case, the permission slip provided by L.B. for A.B. to participate in the Europe trip states that the team "will be supervised by Mark Staropoli, and Margie Turrin." Ascher Decl. Ex. FF. Accordingly, the liability release form signed by L.B. released "Mark Staropoli and Margie Turrin and their associates form [sic] any and all liability arising from injury or injuries sustained by my child while participating in the trip's activities." *Id.* A temporary, nonparent custodian's duty is "coextensive with and concomitant to its physical custody of and control over the child." *Pratt*, 39 N.Y.2d at 560, 384 N.Y.S.2d 749, 349 N.E.2d 849. Here, neither Direct Kick Soccer nor Walkley assumed custodial re-

---

**38.** For the reasons stated in Section II.B., *supra*, the incident at Hooters during the Thanksgiving weekend tournament in Delaware does not give rise to liability on Turrin's part, and Plaintiffs allege no instances of sexual misconduct after the Thanksgiving weekend tournament that occurred while A.B. was within Turrin's custody and control.

sponsibility for A.B. during the Europe trip; only Mark and Turrin did.

■ Furthermore, Plaintiffs' claim of negligence against Direct Kick Soccer and Walkley fails for the additional reason that there is no evidence that Walkley had either actual or constructive notice that Mark would commit sexual assaults upon A.B. during the Europe trip, *Jamal P.*, 24 A.D.3d at 303, 808 N.Y.S.2d 609, or, assuming *arguendo* that Direct Kick Soccer and Mark were in an employer-employee relationship[39], that Direct Kick Soccer " 'knew or should have known of [Mark's] propensity for the conduct which caused the injury' prior to the injury's occurrence." *Ehrens*, 385 F.3d at 235. Plaintiffs admit that "[p]rior to the trip to Europe in July/August, 2004, no one informed Walkley of any behavior by Staropoli that indicated a propensity to engage in sexual acts with a minor." Pls.' Responses to Joint 56.1 ¶ 31.

Moreover, there is no evidence that anyone spoke to Walkley either before, during, or after the Europe trip about any inappropriate conduct engaged in by Mark and A.B. *See* Feinberg Decl. Ex. AA (Fanshawe Depo.) at 63:24–64:2, 79:14–25; Feinberg Decl. Ex. N (Gibson Depo.) at 38:4–39:25; Feinberg Decl. Ex. O (Moore Depo.) at 21:17–20; Feinberg Deck Ex. Z (Schmidt Depo.) at 14:18–15:10, 39:10–21; Feinberg Decl. Ex. L (Turrin Depo.) at 126:17–127:10; Feinberg Deck Ex. M (Panayotidis Depo.) at 138:7–10; Feinberg Deck Ex. P (Young Depo.) at 205:6–11, 206:17–19; Ascher Decl. Ex. F (Young Depo.) at 114:6–8; Feinberg Decl. Ex. AB (Walkley Depo.) at 77:17–78:6 (the only complaint made to Walkley about Mark during the Europe trip was that he was demanding of the kids; no other complaints were made to Walkley about Mark during the trip, and no one made any complaints to Walkley about Mark after the Europe trip). As Walkley himself testified, no one ever suggested to him that Mark was having a sexual relationship with a player during the Europe trip, nor did anyone suggest to him prior to the trip that Mark had engaged in inappropriate contact with any player. Goldberger Reply Deck (Docket # 96–1) Ex. A (Walkley Depo.) at 91:22–92:4; *see* Feinberg Decl. Ex. AB (Walkley Depo.) at 61:8–18 (Walkley did not see anything inappropriate between any of the Clarkstown Soccer players or their guests while in Europe; no one said anything to him regarding inappropriate contact between Mark and any of the female players; he did not communicate with Mark about [A.B.]), 118:23–119:23 (no one suggested to Walkley either before or during the Europe trip that Mark had engaged in sexually inappropriate conduct with underage girls or any of his players), Walkley acknowledged that he had a conversation during the trip with Francine Frey in which Frey commented that A.B., was "taking [her] place," Ascher Decl. Ex. L (Walkley Depo.) at 75:21–22, but Walkley did not know what that meant, *id.* at 75:23–24, and he did not interpret that as a sexual comment, nor

---

**39.** There is no evidence that Direct Kick Soccer and Mark were in an employer-employee relationship at the time of the Europe trip. Walkley testified that he had never spoken to or met Mark until he received a phone call from Mark regarding the Europe trip. Feinberg Deck Ex. AB (Walkley Depo.) at 44:4–14. In addition, Walkley testified that he did not pay either Mark or Turrin for coaching the team that went on the Europe trip, and that they both paid their own expenses for going on the trip. *Id.* at 58:10–59:11. Plaintiffs claim that Mark testified that while he may not have received a salary from Direct Kick for the Europe trip, a portion of his expenses were paid in Mark's capacity as a coach for the team. *See* Pls.' Omnibus Brief in Opp. at 48. However, the deposition pages cited and submitted with Plaintiffs' opposition papers (Ascher Deck Ex. I, Mark Depo., Part II, 69:10–70:22) do not include such testimony.

did Frey mention sex during that conversation. Feinberg Decl, Ex. AB (Walkley Depo.) at 119:24–120:4. Plaintiffs cite a conversation that Walkley had with a friend of his, Pete Patrikis, regarding the allegations of misconduct between Mark and A.B., but this conversation took place after the Europe trip, *see* Feinberg Decl. Ex. AB (Walkley Depo.) at 68 (Walkley contacted Mark about the allegations after his return from the Europe trip); Ascher Decl. Ex. L (Walkley Depo.) at 70 (Walkley spoke to Patrikis after he spoke to Mark), and all that the two discussed was "What have you heard?" and whether each of them thought the allegations were true, to which they both replied that they were unsure. Ascher Decl. Ex. L (Walkley Depo.) at 70:10–71:20. Thus, these two conversations do not establish that Walkley had actual or constructive notice that Mark would engage in inappropriate sexual behavior with A.B. either prior to or during the Europe trip.[40]

To the extent that Walkley testified that he paid Mark to work as a coach at the Direct Kick Soccer camp that he ran after the return from Europe, from August 9–13, 2004, which A.B. attended, *see* Feinberg Decl. Ex. AB (Walkley Depo.) at 61:22–64:6, Plaintiffs' claim against Direct Kick Soccer and Walkley does not include that time period, as it is based only on incidents of sexual misconduct that occurred on the tournament trip to Europe.

*See* Feinberg Decl. Ex. C (Amended Complaint) ¶ 103. In any event, there is no evidence that Walkley was aware of the allegations of misconduct between Mark and A.B. either before or during that soccer camp, nor are there any allegations or evidence that any incidents of sexual misconduct during that week were "committed on the employer's premises," *Ehrens*, 385 F.3d at 235, *i.e.*, in locations linked in any way to Direct Kick Soccer. *See* Spinella Decl. Ex. A (A.B. Depo.) at 342:16–24 (inappropriate acts during those five or six days occurred in Mark's home).

Therefore, summary judgment is granted to Direct Kick Soccer and Walkley.

## E. Defendants' Cross-claims and Counterclaims

In light of the Court's dismissal of Plaintiffs' claims asserted against all Defendants except for Mark (who did not file a motion for summary judgment), the cross-claims for contribution and indemnification asserted by Turrin, Direct Kick Soccer, Walkley, and Paula[41] against all Co–Defendants, as well as Paula's counterclaims against L.B. for contribution and indemnification, should be dismissed as moot. *See generally Delaney v. Town of Carmel*, 55 F.Supp.2d 237, 240–41 (S.D.N.Y.1999) (where court dismissed plaintiffs' claims, it dismissed as moot defendants' cross-claims and counterclaims for contribution and indemnification).[42]

---

**40.** A.B. testified that Mark thought there were video cameras all around the campus of the university where the team stayed in London and that Mark told her that he "went to Bob Walkley and told him that he was like really scared about that and wanted to see if there was anything he could do to get it erased or check to see if there was anything on the camera." Ascher Decl. Ex, A at 237:12–22. However, when asked, "Did [Mark] tell you why he told Walkley he wanted to look at video surveillance? Did [Mark] say what he told Walkley the reason for looking at this was," A.B. replied, "I don't remember exactly

what he said but I think—**I don't know.**" *Id.* at 238:9–14 (emphasis added). This testimony fails to establish that Walkley knew of an inappropriate relationship between A.B. and Mark.

**41.** Clarkstown Soccer Club and Arcuri did not assert cross-claims in their Answer. See Feinberg Decl. Ex. D.

**42.** Paula Staropoli also has a counterclaim against L.B. for negligent supervision, seeking a judgment against L.B. for any and all damages alleged by Plaintiffs. Feinberg Decl. Ex.

## CONCLUSION

For the above-stated reasons, Defendants' motions for summary judgment (Docket ## 66, 69, 72, 75) are granted. The action is dismissed as against Paula Staropoli, Clarkstown Soccer Club, Nicholas Arcuri, Margaret Turrin, Direct Kick Soccer, and Robert Walkley.[43] Plaintiffs' claims against Mark Staropoli are the only claims that remain in the case. The remaining parties are directed to contact the Court to schedule a final pre-trial conference.

**SO ORDERED.**

H (Paula's Amended Answer) at 25–26. However, the Court cannot see how Paula has standing to assert such a claim on her own behalf, rather than as an offset to her own potential liability. Therefore, since the Court grants Paula's motion for summary judgment on Plaintiffs' claims, Paula's counterclaim against L.B. for negligent supervision is likewise dismissed as moot.

**43.** Because, as noted in footnote 22, *supra,* the Court's analysis applies equally to Defendant Board Members and Employees of the Clarkstown Soccer Club, the Court dismisses Plaintiffs' claims against this Defendant as well, despite the fact that it has not moved for summary judgment.